HARRY C. THOMPSON *v.* WATER RESOURCES COMMISSION OF THE STATE OF CONNECTICUT ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued November 13, 1969—decided January 15, 1970

*Herbert L. Cohen,* for the appellant (plaintiff).

*Brian E. O'Neill,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellee (named defendant).

*Charles M. Needle,* for the appellee (defendant Huntley Stone et al., executors, Estate of J. Kenneth Bradley).

KING, C. J. The defendant applicant, J. Kenneth Bradley, since deceased,[1] was the owner of a parcel

---

[1] Counsel has stipulated that the Estate of J. Kenneth Bradley, through its personal representative, is substituted as a party defendant.

of land located in the Gray's Creek area of the town of Westport. Gray's Creek is a tidal stream, and the area immediately surrounding it, although primarily residential, consists of marshland, beaches and some woodland. The applicant, pursuant to his plans to subdivide his property for a high-grade residential development, filed an application with the water resources commission, hereinafter referred to as the commission, seeking a permit (1) to dredge and excavate an area of land measuring 140 feet by 100 feet to a maximum depth of 3.9 feet below mean low-water mark; (2) to use the dredged material so obtained to fill a small channel which separates two parcels of his land; and (3) to fill in a concave area along approximately 130 feet of shoreline of property which the applicant owns, thereby extending the property a maximum of fifty feet beyond the present mean high-water mark.

On March 27, 1968, the commission held a public hearing to consider the application. As a result of the hearing, and despite much opposition to the granting of the application, the hearing examiner recommended to the commission that the permit be granted. On May 20, 1968, the commission voted unanimously to issue the permit. The plaintiff, who owns land practically adjoining the Bradley property, appealed to the Superior Court, claiming that, in granting the permit, the commission had acted arbitrarily, illegally and in abuse of its discretion. From the action of the Superior Court dismissing his appeal, the plaintiff has appealed to this court.

General Statutes § 25-17 provides that an aggrieved person may appeal from a decision of the water resources commission. The plaintiff's aggrievement has not been questioned. His home is in close proximity to the area to be dredged and to the

property the shoreline of which is to be extended by the proposed filling operation.

General Statutes § 25-11, as amended by No. 574, § 2, of the 1963 Public Acts, provides that "no person . . . shall remove sand, gravel or other material lying below the mean high water mark of the tidal and coastal waters of the state unless such person . . . obtains a permit from the commission". It was pursuant to this statute that the applicant sought a permit for the dredging and removal described above. In considering such applications, the commission is charged by statute to give due regard to "the prevention or alleviation of shore erosion, the protection of necessary shell-fish grounds and finfish habitats, the preservation of necessary wildlife habitats, the development of adjoining uplands, the rights of riparian property owners, the creation and improvement of channels and boat basins, the improvement of coastal and inland navigation for all vessels including small craft for recreational purposes and the improvement, protection or development of uplands bordering upon tidal and coastal waters, with due regard for the rights and interests of all persons concerned." General Statutes § 25-10, as amended by No. 574 § 1, of the 1963 Public Acts.

As to the filling operations, the applicant likewise had to obtain a permit (General Statutes § 25-7d, as amended by No. 587 of the 1965 Public Acts), and with regard to the granting of these permits the commission is charged, in § 25-7b, enacted in 1963, to act "with due regard for the prevention or alleviation of shore erosion, the use and development of adjoining uplands, the improvement of coastal and inland navigation for all vessels, including small craft for recreational purposes, the use and develop-

ment of adjacent lands and properties and the interests of the state, including pollution control and recreational use of public waters, with proper regard for the rights and interests of all persons concerned."

Although applications for filling and applications for dredging are regulated by different statutes, the applicant submitted his request as one for a single permit, and the commission treated it as such. There is no claim that this was not proper procedure, and as can be seen by the statutes quoted above the standards for the granting of each type of permit are quite similar.

The plaintiff's basic claim is that the commission, in granting the permit, could not have acted with due regard for the above-quoted statutory guidelines because the evidence presented to the commission was such that the only conclusion which the commission could have legally reached was that the application should be denied. In support of this claim, the plaintiff points out that a number of neighboring landowners submitted letters to the commission expressing strong opposition to the proposal, largely on the ground that the dredging operation would be harmful to the shellfish, fin fish and birds which inhabit the area. Local opposition also included a petition signed by nearby residents. A letter from the Westport Conservation Commission asked that the permit be denied because the proposal would result in the destruction of marshland. In addition, the shellfish commissioner submitted a letter to the commission which stated in effect that, because of the extensive development of the Gray's Creek area in the past, what remains is critical to the support of a balance of wildlife, fin fish and shellfish ecology and that therefore the permit

should be denied. A letter from the director of the state board of fisheries and game recommended that, because of extensive filling operations in the Gray's Creek area in the past, no further filling should be allowed below the mean high-water mark. The plaintiff and his attorney claimed at the hearing, although this claim was unsupported by any expert testimony, that if the shoreline of the property adjoining that of the plaintiff is extended by the filling operation, a "catch basin" will be created on the plaintiff's property which will cause debris to be carried by winds, tides and current to, and be caused to collect upon, the plaintiff's beach.

It is clear from the record that the hearing examiner was fully aware of the commission's duty to act with due regard for the various interests enumerated in the statute. Indeed, specific reference was made during the hearing to the commission's duty to act with due regard for the general public, neighboring landowners, conservation, recreation, and the ecological balance of the area. A reading of the record makes it clear that the commission's decision was completely consistent with the aforementioned considerations. It must be kept in mind that the conclusions reached by the commission must be upheld if they are reasonably supported by the evidence which was presented. *Conley* v. *Board of Education,* 143 Conn. 488, 492, 123 A.2d 747; see *Jaffe* v. *State Department of Health,* 135 Conn. 339, 353, 64 A.2d 330.

Although the petition opposing the granting of the permit was signed by about 60 percent of the neighboring landowners, the great bulk of the letters and testimony in opposition was based on claimed fear of damage to the general ecology of the area rather than upon any particular feature of the ap-

plicant's proposal. This was also the case with the letters from the board of fisheries and game, the shellfish commissioner and the Westport Conservation Commission, all recommending that the permit be denied. They stated objections which would be equally applicable to any and all filling and dredging operations in the Gray's Creek area.

Other evidence before the commission indicated that the applicant's plans would result in very little damage to the ecology of Gray's Creek. Evidence presented included testimony that the dredging would actually reduce the tendency of debris to collect near the plaintiff's property, that the existence of a residential development of the type proposed would not discourage the presence of wildlife, that filling the artificial channel would actually return the property to its natural state, that the dredging would open up a pond which might otherwise become landlocked and stagnant, and that the dredging would give two property owners access by water to Long Island Sound.

While from the point of view of conservation, considered as a single factor, it might be ideal that the land be kept in its natural state, there was evidence which indicated that the choice was not quite that simple. For example, there was evidence before the commission, which supported the conclusion of the hearing examiner, that possible alternative uses of the applicant's land, such as for an extensive marina, would be more damaging to the ecology of Gray's Creek than would the residential development as proposed. Certainly it was the province of the commission to consider possible alternative uses of the applicant's property, especially since the exclusion of that property from all feasible uses would run into constitutional difficulties as an employment

of the police power in such a manner as to constitute a taking of the property without condemnation. See cases such as *Samp Mortar Lake Co.* v. *Town Plan & Zoning Commission,* 155 Conn. 310, 312, 231 A.2d 649, and cases therein cited. The conclusion that the present plan would be, in the long run, the best from the viewpoint of conservation and the other enumerated factors was fully justified upon the evidence.

Not to be overlooked is the commission's duty to consider the effect its action would have on the uplands and any benefits to the applicant's property. There was evidence before the commission that the filling operations would substantially improve the proposed building lots affected by it.

At one point in his brief, the plaintiff seems to claim that the commission's decision is in error because it was brought about by mistake as to the size of the area to be dredged. The plaintiff's basic position before the commission was that the entire Gray's Creek area was threatened by the proposed dredging and filling. Several times the hearing examiner reiterated that the area to be directly affected was limited to those relatively small areas described in the application, and he correctly described the area to be dredged. At one point, however, he stated that "the only area that's shown on this map that would be dredged is an area that's about 20 feet wide and about 140 feet to 150 feet long." This, of course, was erroneous, being a description of the creek to be filled rather than the area to be dredged. The area to be dredged, as described in the application and the permit which was granted, was approximately 100 feet by 140 feet. It is clear that the hearing examiner understood this because not only did he describe the area

correctly three times during the hearing but, in addition, described it correctly in his report to the commission. Even if we assume that the plaintiff is correct in stating that the misdescription showed a lack of understanding on the part of the hearing examiner, the most which can be said is that at that particular point in time during the hearing the examiner was mistaken as to the size of the area which was to be dredged. It is obvious that by the time the hearing examiner's report was prepared, and before the commission made its decision, any momentary mistake had been corrected.

The plaintiff claims that the case of *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 153 A.2d 444, indicates that the application should have been denied. In that case the court upheld the decision of the water resources commission in denying an application for a permit to dig a channel and remove the materials obtained from the excavation. The court stated that the commission could reasonably have concluded that a channel of the large dimensions proposed would have required the taking of unwarranted quantities of state-owned underwater sand and gravel for private purposes and that therefore the denial of the permit was proper. Id., 625, 626. In reaching this conclusion, the court pointed out that the proposed operation appeared to be primarily a commercial venture by a sand and gravel company seeking to obtain the material to be dredged from the channel. The court did not state, as the plaintiff suggests, that no permit for dredging can be granted when the dredging is to be done for a commercial purpose.

In conclusion we find that the decision of the commission is fully supported by a permissible and reasonable view of the evidence and that the Supe-

rior Court was not in error in affirming the decision of the commission and dismissing the appeal.

There is no error.

In this opinion House, Thim and Ryan, Js., concurred.

Alcorn, J. (dissenting). I disagree. We do not know what the conclusions of the commission were because it did not "state upon its records its finding and reason for the action taken" as § 25-12 of the General Statutes required it to do. Before the action of the water resources commission should be declared to be a legal and reasonable exercise of discretion, its own conclusions, rather than the recommendations made to it by a field examiner and a hearing examiner, should appear to demonstrate the basis for an order which is to prevail over the judgment of the other equally responsible public agencies which opposed the action taken.