## Robin B. Huck *v.* Inland Wetlands and Watercourses Agency of the Town of Greenwich
### (12876)

Healey, Shea, Santaniello, Callahan and Moraghan, Js.

Argued January 15—decision released May 19, 1987

*Eugene F. McLaughlin, Jr.,* assistant town attorney, for the appellant (defendant).

*W. James Cousins,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. The plaintiff is Robin B. Huck, the owner of a tract of land comprising 2.691 acres,[1] zoned for residential use and located on the westerly side of Stamwich Road in Greenwich. The defendant is the inland wetlands and watercourses agency of the town of Greenwich (agency), which was created pursuant to General Statutes §§ 22a-36 through 22a-45.

On May 22, 1978, the plaintiff filed an application for a permit to construct a single-family dwelling on her property which is adjacent to Frye Lake, a regulated watercourse. On January 7, 1980, the agency held a public hearing on that application. At an agency meeting on February 25, 1980, on a motion made and seconded to approve the application on certain conditions, the vote of the agency was three in favor, three opposed and one abstention. The agency issued a writing dated March 3, 1980, signed by the secretary of the agency stating that the application was denied. That writing set out the agency's reasons for denying the plaintiff's application. On March 11, 1980, a notice to that effect was published in a Greenwich newspaper. By letter dated March 20, 1980, the plaintiff made demand upon the agency to issue the permit, maintaining that issuance of the permit was mandated by § 6.2[2]

---

[1] At the January 7, 1980 public hearing on the plaintiff's application, the plaintiff's counsel conceded that a "[v]ery substantial percentage" of the 2.6 acres was "in the lake" and, when estimating the percentage of the property that was under water, he agreed with a commission member "that it would appear to be in the neighborhood of 80 [percent]." In its February 25, 1980 decision, the agency specifically found that "[a]lthough the lot area including the Lake surface and upland measures 2.691 acres, only .484 acres is dryland."

[2] Section 6.227 (b) of the Greenwich Municipal Code, which is Inland Wetlands and Watercourses Agency Regulations § 6.2, provides in part: "The Agency shall inform the applicant of its decision in granting, with or without conditions, or in denying a permit. . . . Failure of the Agency to take action on an application within sixty-five (65) days after the completion of a public hearing shall constitute approval of such application."

of the agency's regulations. This section requires, inter alia, that agency action by way of granting, granting with conditions, or denying an application be taken within 65 days of a public hearing. The agency did not issue the permit. The plaintiff, alleging that she was aggrieved by the conduct of the agency, took an appeal to the Superior Court.[3] In that appeal, the plaintiff asked the court to: (1) reverse the action of the agency and declare it to be null and void; (2) direct the agency to approve the permit; and (3) grant such other and further relief as the court deemed just and equitable.

On appeal, the trial court found that the plaintiff was aggrieved and that the "members, or member, who did not attend the public hearing but acquainted themselves with the issues properly voted." Turning to the plaintiff's claim that "no action [by the agency]" was taken within 65 days of the hearing, the court adverted both to General Statutes § 22a-42a (c)[4] and § 6.2 of the agency's regulations. After a brief reference to our decision in *Merlo* v. *Planning & Zoning Commission,* 196 Conn. 676, 495 A.2d 268 (1985), the trial court said that the "parliamentary posture after *Merlo* . . . is that we have a technical denial with no reasons stated." This conclusion came after the court queried the basis and the reasons for the agency's disapproval. Referring to the reasons of denial, dated February 25, 1980, the trial court opined that "[i]t is hard to believe that on a 3 to 3 vote with one abstention on a motion to permit, the agency would have its reasons for denial unless

---

[3] The plaintiff's appeal to the Superior Court from the agency's denial of her application is an "appeal" in seven counts containing in all about one hundred seventeen allegations.

[4] General Statutes § 22a-42a (c), which concerns municipal inland wetlands agencies provides, inter alia: "Action shall be taken on applications within sixty-five days after the completion of a public hearing or in the absence of a public hearing within sixty-five days from the date of receipt of the application."

[it] had prejudged the February 25, 1980 vote." Noting that General Statutes § 22a-42a (d) requires that "[i]n granting, denying or limiting any permit for a regulated activity the inland wetlands agency . . . shall state upon the record the reason for its decision," the trial court stated that the agency failed to meet these requirements. The court reasoned, therefore, that all that was before it was "a technical denial [under *Merlo*] with no reasons stated" and that the record was "barren as to what each commissioner believed were the reasons for denial . . . . " Finding that there were no reasons for denial "properly before the court," although the statute mandated that the agency state its reasons, the trial court then determined that it would "search the record for reasons to support the agency's decision."

Citing the agency's statement of reasons dated February 25, 1980, the trial court stated: "The mood of the agency which appears from the return of record is as follows: 'Common sense would suggest that the proposed development would result in the degradation of water quality in Frye Lake.' " It also observed that its review of the return of record showed that the plaintiff had "made every effort to comply with the demands of the agency" and that while the agency stated that there were alternatives, it did not "articulate the alternatives to the plaintiff." The court stated that "the intent of the agency . . . considering the totality of circumstances [was] to have the land remain in its natural state" and also said that it could not "conceive of any reasonable use which the plaintiff could make of the property in its natural state." The trial court then found that the plaintiff had "been finally deprived by the agency of the reasonable and proper use of the property and that there had been an unconstitutional taking without just compensation." Citing

General Statutes § 22a-43a,[5] the court sustained the appeal, set aside the "action" of the agency and remanded the matter to the agency for action not inconsistent with its decision. The agency has appealed.

On appeal, the agency essentially[6] claims that the trial court erred in: (1) finding that the plaintiff was aggrieved; (2) rejecting the reasons stated in the record for its decision on the application; and (3) finding that there had been an unconstitutional taking of the plaintiff's property. The plaintiff, on the other hand, has urged alternate grounds for affirming the trial court's judgment. See Practice Book § 4013 (a) (1) (formerly § 3012). These are: (1) the agency's decision was rendered on unlawful procedure in that its decision was rendered upon the vote of a member who had not been present at the public hearing, had not read the transcript of the public hearing and had not apprised himself of the evidence before voting against the application; (2) the plaintiff's application was approved by operation of law because the agency took no action on it within 65 days of the public hearing; (3) the agency's failure to grant the application was against the reliable probative and substantial evidence in the record; and (4) the agency's decision was arbitrary and capricious and characterized by an abuse of discretion.

---

[5] General Statutes § 22a-43a provides: "(a) If upon appeal pursuant to section 22a-43, the court finds that the action appealed from constitutes the equivalent of a taking without compensation, it shall set aside the action or it may modify the action so that it does not constitute a taking. In both instances the court shall remand the order to the inland wetland agency for action not inconsistent with its decision.

"(b) To carry out the purposes of sections 22a-38, 22a-40, 22a-42 to 22a-43a, inclusive, 22a-401 and 22a-403, the commissioner, district or municipality may at any time purchase land or an interest in land in fee simple or other acceptable title, or subject to acceptable restrictions or exceptions, and enter into covenants and agreements with landowners."

[6] These are the essential issues raised by the agency although they are divided into numerous subsets consuming eight pages in the table of contents in its brief.

We first address the agency's claim that the trial court erred in finding that the plaintiff was aggrieved. " ' "The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, 'the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision.' . . . " ' *Cannavo Enterprises, Inc.* v. *Burns,* 194 Conn. 43, 47, 478 A.2d 601 (1984); *Bakelaar* v. *West Haven,* 193 Conn. 59, 65, 475 A.2d 283 (1984). 'Aggrievement is established if "there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." *O'Leary* v. *McGuinness,* 140 Conn. 80, 83, 98 A.2d 660 (1953).' *Hall* v. *Planning Commission,* 181 Conn. 442, 445, 435 A.2d 975 (1980)." *State Medical Society* v. *Board of Examiners in Podiatry,* 203 Conn. 295, 299–300, 524 A.2d 636 (1987). A person does not become aggrieved, however, until the agency has acted. *Hall* v. *Planning Commission,* supra, 444.

The plaintiff's status as owner of the property establishes that she has "a specific personal and legal interest in the subject matter of the decision." The fact that the agency's decision resulted in the denial to the plaintiff of the ability to use this property as proposed establishes that "this specific personal and legal interest has been specially and injuriously affected." The court correctly concluded that the plaintiff was aggrieved by the agency decision.

The agency claims that the plaintiff was not "aggrieved" because the case had become "moot" between the time of the agency's decision and the hear-

ing on aggrievement in the trial court. The agency's argument is based on the fact that there had been a change in the state health code and the Greenwich health code with regard to septic systems so that the particular septic system proposed by the plaintiff in the application filed with the agency had become "illegal." The agency maintains that because there is no longer a legal right to install the proposed septic system, the plaintiff's appeal is therefore "moot." We disagree. The agency's argument overlooks the testimony before the trial court that a person may apply for variances for septic system permits. Thus, if the plaintiff prevails on the merits of this appeal, she will then have the opportunity to acquire a variance from the state and local health codes and, if successful, construct the residence as planned. The trial court, therefore, correctly concluded that the plaintiff was aggrieved. Our decision in *McCallum* v. *Inland Wetlands Commission*, 196 Conn. 218, 492 A.2d 508 (1985), does not require a contrary result.

The agency next claims that the trial court erred in rejecting the reasons stated in the record for the agency's decision on the application. Although the agency sets out some fifteen subsets of this broad claim, the issues basically distill out as follows: The trial court erred in rejecting the valid reasons stated in the record for its decision and in substituting its own judgment of the record; the trial court erred in its analysis of the nature and effect of the vote of the agency in which six of its members properly participated; and the trial court erred in not concluding that there was substantial evidence in the record to support the agency's denial of the application.

We must first determine whether the trial court correctly analyzed the matter of the agency's vote of February 25, 1980, and its legal consequences because the court's determination of this issue was the basis

for its decision to embark upon its own evaluation of the record without seriously considering the agency's stated reasons. The trial court decided to search the record for support of the agency's denial because it had interpreted the 3 to 3 vote on the motion to approve with conditions with no further motion either to permit or to deny with reasons as amounting, under *Merlo,* to a technical denial with no reasons stated.

We do not agree with the plaintiff's claim that the agency's decision was "illegal" because Frank E. Wolf, who voted against the application, had not been present at the public hearing, had not read the transcript of the public hearing and had not apprised himself of the evidence before voting. The trial court specifically found that "[t]he members, or member, who did not attend the public hearing but acquainted themselves with the issues properly voted."[7] While the plaintiff implicitly argues that this was not a finding by the trial court, fairly read, it constitutes a finding. Significantly, if the plaintiff had any question that it was not, she could have requested an articulation which we note was not done. Practice Book § 4051 (formerly § 3082).

With this, we come to the question of whether the vote constituted "action" by the agency and, if it did, what was its basis, reasons and consequences. The statutes and the agency's regulations require that the agency take "action" on an application "within sixty-five [65] days after the completion of a public hearing . . . ." General Statutes § 22a-42a (c); Inland Wetlands and Watercourses Regulations § 6.2; Greenwich Municipal Code § 6.227 (b). Under its regulations, the agency is permitted to act in only three ways: it may grant a permit, it may grant a permit with conditions

[7] The transcript of the public hearing of January 7, 1980, lists on its cover those agency members present at the public hearing. Neither Frank E. Wolf, who voted to deny the plaintiff's application, nor Gray Taylor, who voted to grant the plaintiff's application, is listed as present.

or it may deny a permit. The agency contends that it took "action" and denied the application stating its reasons. The plaintiff claims that the agency did not take any of the permitted courses of action. We agree with the agency.

The circumstance that the vote of the agency on the application was upon a motion to *approve with conditions* which resulted in a 3-3 tie vote and that there was no further motion to deny, or for that matter any further motion, does not warrant an extended discussion. See *Merlo* v. *Planning & Zoning Commission,* supra, 682–83. In *Merlo,* we pointed out that "the failure of an application to garner enough votes for its approval amounts to a rejection of the application. *Lupinacci* v. *Planning & Zoning Commission,* 153 Conn. 694, 696, 220 A.2d 274 (1966); *Hall* v. *Planning & Zoning Board,* 153 Conn. 574, 576, 219 A.2d 445 (1966)." *Merlo* v. *Planning & Zoning Commission,* supra, 683.[8] In this

---

[8] The plaintiff claims that this case is clearly distinguishable from *Merlo* v. *Planning & Zoning Commission,* 196 Conn. 676, 495 A.2d 268 (1985) *(Merlo II).* It is true that in *Merlo,* we did not have the circumstance of a tie vote on the motion in question. Rather, there was a motion to *approve* the application which was defeated by a vote of five to four and no motion to disapprove was ever voted upon and yet we held that the commission's determination that the application was "DISAPPROVED" was legally proper and constituted timely "action" under the applicable statute.

In *Merlo II,* supra, 683, we pointed out that "[w]e have previously held that the failure of an application to garner enough votes for its approval amounts to a rejection of the application. *Lupinacci* v. *Planning & Zoning Commission,* 153 Conn. 694, 696, 220 A.2d 274 (1966); *Hall* v. *Planning & Zoning Board,* 153 Conn. 574, 576, 219 A.2d 445 (1966)." The plaintiff argues that "as a matter of law and for strong policy reasons the decision by the Appellate Court in *Merlo* v. *Planning & Zoning Commission,* 1 Conn. App. 621, 474 A.2d 477 (1984) *[Merlo I],* is the more persuasive" especially because of the Appellate Court's method of distinguishing *Lupinacci* and *Hall,* both of which cases we must note involve tie votes. The Appellate Court stated: "These cases [*Hall* and *Lupinacci*] fall short of interpreting the action of the commission in this case as a disapproval under the statute. They simply stand for the proposition that if a majority of votes is necessary for approval of a change of zone, the failure to secure such majority means the application was denied." *Merlo I,* supra, 626. The plaintiff argues,

case, the motion to grant the application with conditions did not receive the majority vote necessary for approval and the records of the agency of February 25, 1980, stated the "denial" of "Application #78-70" (the plaintiff's application). This constituted "action" by the agency within the 65 day period required. Moreover, the agency accompanied its "action" with reasons stated in the record for such action.

We next consider the circumstance that the motion to approve the application included certain conditions not contained in the application as submitted. Practically speaking, the tie vote on the application as modified by the conditions fairly indicates that the original application, without such conditions, would also have failed to have received a majority vote. Likewise, if any agency member favored approval of the application without the conditions and believed that a majority might be similarly inclined, we may fairly presume that such a motion would have been made. No such motion, however, was made. Under these circumstances, it is difficult to see how the trial court could characterize the denial as "technical" as opposed to a denial that was "substantive."

pointing to the Appellate Court decision which we reversed, that where "an applicant is applying to change or vary legislation, such as a change of zone, it is reasonable that unless a majority votes for the change, the existing legislation remains unaltered [and] [t]he status quo is preserved." In contrast, however, she argues that here "there is no status quo to be preserved when an administrative agency [here the wetlands agency] acting in a quasi-judicial function fails to affirmatively determine whether a site plan conforms to the applicable statutes or regulations." In urging us to apply this distinction in this case, the plaintiff has not cited any applicable statute or Connecticut case or parliamentary law that reasonably supports this argument. Our decision in *Merlo II* does not so distinguish *Lupinacci* or *Hall*. Moreover, there is authority for the proposition that "[u]nder common law or parliamentary law, an affirmative resolution or action which is the subject of a tie vote fails of adoption." 59 Am. Jur. 2d, Parliamentary Law § 11, p. 326.

The requirement that the agency take "action" within the prescribed 65 day period is to insure prompt and expeditious action for the protection of the applicant. See *Merlo* v. *Planning & Zoning Commission,* supra, 683; *Finn* v. *Planning & Zoning Commission,* 156 Conn. 540, 544, 244 A.2d 391 (1968). The object of this requirement is furthered by informing the applicants with certainty that the agency has acted so as to trigger the option of taking an appeal. In this case, the plaintiff alleged in her complaint that "the AGENCY issued a writing dated March 3, 1980, stating that Application No. 78-70 for a permit was denied, and caused a notice to be published to that effect on March 11, 1980, in a newspaper, Greenwich Time." See General Statutes § 22a-42a (d). The plaintiff does not contend that she was not timely notified by mail of the agency's decision.

We note also that because the agency itself regarded its vote of February 25, 1980, as a denial of the application for the requested permit and the newspaper notice so informed the plaintiff and the public, the application was effectively denied on that date which was well within the time for it to act. Moreover, as in *Merlo,* the agency fulfilled its duty both under the statute and its own regulations by timely taking one of the courses of action prescribed therein. The agency did not, despite the plaintiff's claim to the contrary, fail to take "action" within 65 days of the public hearing.

We next discuss the reasons given by the agency for the denial of February 25, 1980. The trial court determined that although General Statutes § 22a-42a (d) requires that "in denying [or granting or limiting] any permit . . . [the agency] 'shall state upon the record the reason for its decision,' " the agency did not do so. The court stated that "[a]ll we have is a technical denial under *Merlo* [v. *Planning & Zoning Commission*], supra, and no further motions." The court did not accept the

reasons of denial given by the agency dated February 25, 1980, stating that "[i]t is hard to believe that on a 3 to 3 vote with one abstention on a motion to permit, the agency would have its reasons for denial unless the agency had prejudged the February 25, 1980 vote." It then went on to decide that since there are "no reasons for denial properly before the court . . . even though the statute mandates that the agency state its reasons for denial, the court will search the record for reasons to support the agency's decision."

Initially, the comment concerning the agency's prejudgment must be addressed. In all its proceedings, a regulatory agency " 'must act strictly within its statutory authority, within constitutional limitations, and in a lawful manner.' " *Fusco-Amatruda Co.* v. *Tax Commissioner,* 168 Conn. 597, 604, 362 A.2d 847 (1975). Hearings before administrative agencies, such as this agency, although informal and conducted without regard to the strict rules of evidence, "must be conducted so as not to violate the fundamental rules of natural justice." *Connecticut Fund for the Environment, Inc.* v. *Stamford,* 192 Conn. 247, 249, 470 A.2d 1214 (1984); see *Pizzola* v. *Planning & Zoning Commission,* 167 Conn. 202, 207, 355 A.2d 21 (1974). "Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." *Connecticut Fund for the Environment, Inc.* v. *Stamford,* supra; see *Welch* v. *Zoning Board of Appeals,* 158 Conn. 208, 212–13, 257 A.2d 795 (1969). There is no question that the plaintiff was also entitled to have her application heard and determined by an impartial and unbiased agency. What we said in *Obeda* v. *Board of Selectmen,* 180 Conn. 521, 523–24, 429 A.2d 956 (1980), bears repeating: "While it is true

that neutrality and impartiality of members of administrative boards and commissions are essential to the fair and proper operation of these authorities . . . a charge of bias must be supported by some evidence proving probability of bias before an official can be faulted . . . . " Because public officers, acting in their official capacities, are presumed, until the contrary appears, to have acted legally and properly; *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 7, 513 A.2d 1218 (1986); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles,* 165 Conn. 559, 568, 345 A.2d 520 (1973); *Hills* v. *Zoning Commission,* 139 Conn. 603, 608, 96 A.2d 212 (1953); the burden on such a claim rests upon the person asserting it. See, e.g., *Obeda* v. *Board of Selectmen,* supra; *Whittaker* v. *Zoning Board of Appeals,* 179 Conn. 650, 654, 427 A.2d 1346 (1980). On a review of the record, we cannot agree with the trial court that given the vote which resulted in denial, "[i]t is hard to believe that on a 3 to 3 vote with one abstention on a motion to permit, the agency would have its reasons for denial unless the agency had prejudged the February 25, 1980 vote." The necessary prejudgment has not been shown. The trial court should have considered the reasons given by the agency rather than disregard them.[9]

In referring to the reasons given, the agency claims that extensive and substantial evidence supports many

---

[9] In a somewhat anomalous fashion, the trial court, after deciding there were "no reasons for denial properly before the court" and determining to search the record for reasons to support the agency's decision, nevertheless concluded that "[t]he mood of the agency which appears from the return of record is as follows: 'Common sense would suggest that the proposed development would result in a degradation of water quality in Frye Lake.' " This was *one* of the reasons that the agency gave for denying the application. While this "reason" given by the agency and used by the trial court to characterize the "mood" of the agency is not controlling, common sense maintains a proper place in a judicial or administrative proceeding. See, e.g., *D'Arcy* v. *Shugrue,* 5 Conn. App. 12, 21, 496 A.2d 967, cert. denied, 197 Conn. 817, 499 A.2d 56 (1985).

of the reasons for the denial. The plaintiff claims, in attacking the reasons given, that "[e]ach and every reason published by the [agency] for its denial of plaintiff's application is against the substantial weight of the evidence on the whole record" and that the denial "was against the reliable, probative, and substantial evidence on the whole record." Arguing that the reasons given were in conformity with matters to be considered under General Statutes § 22a-42a (d),[10] the agency claims that the evidence supports the denial and that the court should not have substituted its judgment and discretion for that of the agency to come to a different conclusion. The plaintiff, on the other hand, maintains that four experts from four different fields provided substantial testimony that the proposed dwelling would have no adverse effect on the adjacent Frye Lake and that the agency did not offer any expert testimony to "rebut any of the evidence" offered by those four experts. She also claims that the agency's own staff field report referred to at the hearing is "substantially in accord" with the evidence she presented at the public

[10] General Statutes § 22a-42a (d), which concerns municipal inland wetlands agencies, provides in part: "In granting, denying or limiting any permit for a regulated activity the inland wetlands agency shall consider the factors set forth in section 22a-41 and such agency shall state upon the record the reason for its decision."

General Statutes § 22a-41 provides: "In carrying out the purposes and policies of sections 22a-36 to 22a-45, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to:

"(a) The environmental impact of the proposed action;

"(b) The alternatives to the proposed action;

"(c) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity;

"(d) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity;

"(e) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; and

"(f) The suitability or unsuitability of such activity to the area for which it is proposed."

hearing and that it is clear from the record that the agency "totally disregarded the overwhelming, reliable and probative evidence" that she presented. The agency points to evidence, including some relied upon by the plaintiff, in arguing that the denial was proper.

The denial of February 25, 1980, contained a number of reasons.[11] The agency's decision must be sus-

---

[11] The statement of the denial of February 25, 1980, of the application, including the reasons given, was the following:

"Based on the evidence before the Inland Wetlands and Water Courses Agency, including but not limited to:

"a. the application

"b. field investigations by Agency staff and members

"c. discussions with the applicant's representatives

"d. information on file

"e. the Agency staff reports

"f. information received from adjacent property owners and members of the Frye Lake Association

"g. a public hearing held on January 7, 1980

"h. ecological, limnological and engineering reports submitted by the applicant's representatives

"The Agency finds that:

"1. The purpose of the proposed activities was to allow residential development of a lot in an RA-2 Zone. The activities include the construction of a single family residence with driveway and septic system as indicated on the drawing entitled 'Huck Property—Prepared From Survey by S. E. Minor—T-61' prepared by Donald [M.] Breismeister, revised June 14, 1979 and the drawings entitled 'Septic Design Prepared For Robin Bovard Huck—Greenwich, Ct.' by Joseph F. Risoli, dated February 20, 1979, revised August 10, 1979, Sheets 1 of 4, 2 of 4, 3 of 4 and 4 of 4.

"2. The regulated area consists of the shore line and surface of Frye Lake, a waterbody that falls within the Beaver Brook section of the East Brothers Brook watershed.

"3. Potential adverse environmental impacts associated with the proposed activities include:

"a. severe sedimentation, erosion and downstream siltation into Frye Lake because sedimentation and erosion controls proposed can be expected to be only partially effective because of the steep slopes and shallow soils. All eroded material by-passing the controls will impact Frye Lake.

"b. potential water pollution problems from the installation of the proposed septic system.

"c. impact of day to day living activities around the single family residence because of the absence of adequate yard space.

tained if an examination of the record discloses evidence that supports any one of the reasons given. See *Daviau* v. *Planning Commission,* 174 Conn. 354, 358, 387 A.2d 562 (1978); *Nicoli* v. *Planning & Zoning Commission,* 171 Conn. 89, 94, 368 A.2d 24 (1976); *First Hartford Realty Corporation* v. *Plan & Zoning Commission,* 165 Conn. 533, 543, 338 A.2d 490 (1973); see *Parks* v. *Planning & Zoning Commission,* 178 Conn. 657, 662–63, 425 A.2d 100 (1979). The evidence, however, to support any such reason must be substantial; " ' "[t]he credibility of witnesses and the determination of factual issues are matters within the

---

"4. The proposed residence with deck is within four feet of the edge of Frye Lake. The proposed septic system is within 42 feet of the edge of Frye Lake.

"5. Representatives of the State Health Department, the State Department of Environmental Protection, the Greenwich Health Department and engineers that designed and reviewed the proposed septic system all indicate that the system will work properly but that extreme care must be taken to insure that every element of this complex system is constructed properly.

"6. A limnological analysis prepared by Dr. Eric Walle indicated that Frye Lake was in an advanced eutrophic state and that activities associated with development of this residential lot would not significantly change the character of the Lake. Members of the Frye Lake Association expressed concern that their efforts to improve the quality of the water in Frye Lake through a regular treatment program would be hurt if sedimentation and erosion or septic effluent were to reach Frye Lake from this proposed lot.

"7. Although the lot area including the Lake surface and upland measures 2.691 acres, only .484 acres is dry land. Agency staff concluded that very little land is [available] for the necessary work areas around the proposed residence. In addition, almost all of the land will be disturbed by development activities because of the small land area available for development. No natural buffer areas can be preserved between residential activities and Frye Lake.

"8. The lot is not part of a subdivision that was reviewed and approved by the Planning and Zoning Commission prior to the implementation date of the Greenwich Inland Wetlands and Water Course[s] Regulations.

"9. Common sense would suggest that the proposed development would result in the degradation of water quality in Frye Lake.

"10. The construction of a single family residence with driveway and septic system as proposed will reduce the watercourse's natural capacity to support desirable biological life, and assimilate waste."

province of the administrative agency." ' " *Feinson* v. *Conservation Commission,* 180 Conn. 421, 425–26, 429 A.2d 910 (1980), quoting *Lawrence* v. *Kozlowski,* 171 Conn. 705, 708, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977), and cases there cited. "This so-called substantial evidence rule is similar to the 'sufficiency of the evidence' standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords 'a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' . . . 'The "substantial evidence" rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . [It] imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of "weight of the evidence" or "clearly erroneous" action. . . . ' " (Citations omitted.) *Lawrence* v. *Kozlowski,* supra, 713–14; *Persico* v. *Maher,* 191 Conn. 384, 409, 465 A.2d 308 (1983). The United States Supreme Court, in defining "substantial evidence" in the "directed verdict" formulation, has said that it "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo* v. *Federal Maritime Commission,*

383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966); see *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). "The reviewing court must take into account [that there is] contradictory evidence in the record . . . but 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . .' " *American Textile Manufacturers Institute, Inc.* v. *Donovan,* 452 U.S. 490, 523, 101 S. Ct. 2478, 69 L. Ed. 2d 185 (1981), quoting *Consolo* v. *Federal Maritime Commission,* supra.

We have said that an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair. *Manor Development Corporation* v. *Conservation Commission,* 180 Conn. 692, 697, 433 A.2d 999 (1980). Nothing appears to demonstrate that the four hour hearing of January 7, 1980, was anything but fundamentally fair. It can hardly be claimed that the agency, as did the conservation commission in *Feinson* v. *Conservation Commission,* supra, 428–29, "relying on its own knowledge and experience, acted in a manner which placed its data base beyond the [plaintiff's] scrutiny."

Among the reasons given by the agency for its denial of the plaintiff's application are the following: "3. Potential adverse environmental impacts associated with the proposed activities include [inter alia]: a. [S]evere sedimentation, erosion and downstream siltation into Frye Lake because sedimentation and erosion controls proposed can be expected to be only partially effective because of the steep slopes and shallow soils. All eroded material by-passing the controls

will impact Frye Lake. b. [P]otential water pollution[12] problems from the installation of the proposed septic system . . . ."

It is true that the plaintiff made efforts through her counsel and other professional avenues to advance a proposal, after consultation with staff of the agency and others, that endeavored to meet the requirements for the issuance of a permit. A careful examination of the record, however, discloses that there is substantial evidence to support these reasons. In accordance with the principles set out, we need not address any other reason given for the denial as one is sufficient.

Testifying at the public hearing on behalf of the plaintiff were: Donald M. Breismeister,[13] a professional architect and one of the potential contract purchasers from the plaintiff; Joseph F. Risoli, a licensed professional engineer; and Dr. Eric Walle, an environmental scientist and professor of ecology and limnology. At the end of the hearing, Frank Singleton, who directs the environmental health office in Greenwich, was asked for his comments by the agency chair and spoke favorably on the plaintiff's application. In addition to the presence of the plaintiff's attorney, there was also present an attorney who represented a number of the neighbors around Frye Lake.[14] The transcript of the

[12] General Statutes § 22a-38 (8) contains the following definition: " 'Pollution' means harmful thermal effect or the contamination or rendering unclean or impure of any waters of the state by reason of any waste or other materials discharged or deposited therein by any public or private sewer or otherwise so as directly or indirectly to come in contact with any waters."

[13] Donald M. Breismeister and Frederick Preiss were the purchasers of the property in question by virtue of a 1978 contract with the plaintiff contingent upon the agency's issuance of the permit. At the public hearing, Breismeister admitted that this proposed house was to be built as "a speculative house."

[14] In addition to questioning these experts, the attorney for the neighbors also submitted exhibits which are in the record. One of these exhibits

hearing also discloses active and probing participation by agency members in questioning these experts concerning the background and input of their proposals and opinions.

The testimony and other evidence presented by the experts Breismeister, Risoli and Walle was subjected to close questioning by agency members and at times by counsel for both the plaintiff and neighbors. Breismeister, after discussing the size and nature of the proposed house,[15] was asked by the agency how many baths were involved "that relate to the septic field." He said probably three baths but, as he understood the matter, "the septic field . . . limits the house to a three bedroom house and it doesn't limit the house to the number of baths." The agency, however, indicated its interest in the number of baths. This seems quite appropriate given the nature of the septic system as proposed and discussed, especially since the regulated area involved consists of the shore line and surface of Frye Lake, and when concededly approximately 80 percent of the lot itself was in Frye Lake.

Singleton, while favoring the application, conceded that "because of the uniqueness in the contour of this lot, the fact that it is so narrow, there are a lot of

---

was a five page engineering report from a consulting environmental engineering firm.

The plaintiff's attorney participated in the public hearing and questioned the experts offered by the plaintiff.

[15] At that time, Breismeister said: "The house is 24 feet from the front to the back of the house, it is 60 feet from the north to the south of the house and there are little ear decks extending out ten feet to the south and ten feet to the north and there is a 16 foot by 16 foot deck in the center. There is an entrance deck coming in to the front of the house, the center is the entry and it is a 12 by 12 foot foyer. On the north side on the first level you have a two car garage, above that there is a library-study and above that there are two bedrooms. On the south side you have a kitchen, living room, dining room, above that you have a master bedroom suite. It is a three bedroom house."

environmental problems associated with it . . . . ''
Singleton felt that ''the siltation problem, not the sep-
tic system, is the major problem because of pollution
of the lake.'' Breismeister's presentation of his pro-
posed erosion control plan with other evidence concern-
ing erosion, siltation and sedimentation, and including
but not limited to the steep slopes, shallow soil, drain-
age pattern and the like, furnish a fair basis for the
agency's stated view on its denial. The disturbance of
the slope, the grade of which Breismeister did not
know,[16] by construction and merely walking on it also
was a concern of the agency. The matter of the fill over
the septic field which admittedly changed the drainage
pattern of the lot was questioned. When queried that
he did not have a drainage plan for the property pro-
posed at the time of the hearing, Breismeister main-
tained that a drainage plan was not needed given the
draining off the roof and driveway directly into the lake.

In addition, there was evidence that in July, 1979,
Randy May of the state department of environmental
protection wrote Singleton and said in part that he felt
that ''a septic system could be installed on this site and
the ground water discharge of that system would prob-
ably not cause pollution.'' He said this after saying in
the same letter that ''[t]his small lot, steep slope and
immediate proximity to a lake make it very difficult
to institute any program to prevent siltation.'' After
opining that a septic system could be installed, he also
said: ''The construction difficulties of building that sys-
tem might well result in system malfunction. The mag-
nitude of construction on this site could easily result

[16] One of the agency members, in addition to consulting drawings and
diagrams at the hearing, said that the slope has ''got to be 45 [percent].''
This member also said that merely walking on that slope created a distur-
bance and caused things to roll into the lake.''

Breimeister said that Frye Lake was fifteen acres in area.

in serious siltation problems with resultant action by this unit [state department of environmental protection]."

Risoli, the plaintiff's engineer, who designed the proposed septic system, pointed out the input received and the care which had been exercised in designing the system, noting that "[o]bviously if anyone has seen the lot, it is a rather difficult piece of land to construct a septic system on . . . ." When asked if he could comment on the erosion and sedimentation control plan Breismeister had described, he said: "I think that it is probably the best you can do for the site." The agency later asked Risoli: "You think [the erosion and sedimentation control plan presented by Breismeister] is adequate?" Risoli said: "100 [percent]?" The agency then asked: "No, I said adequate," and Risoli answered: "Yes, I think it is. . . . " Risoli was questioned at length not only concerning his own opinions but those of others in the record, some of the inquiry calling into question the efficacy of proposals and statements he made. Very candidly, he said, "I would honestly state that this particular project in the hands of a contractor would be scary" but that it was a "different situation here, we have professionals who have a lot to lose in this town if this thing isn't done right."

Walle had performed a limnological[17] evaluation of Frye Lake and made a written report. He agreed upon questions from the agency that "the general thrust of [his] testimony . . . was that in this body of water

---

[17] Walle defined "limnology" as "the science of examining lakes with regard to chemical-physical biological properties of the lake and more recently it has taken on the application of an evaluation of perpetual disturbances to those factors which are present in the lake and to the lake itself."

"One word which professional limnotologists use and which is becoming more and more commonplace is the term eutrophication which means the process of a lake aging."

which really is the cove [of Frye Lake adjacent to the locus in quo] . . . a condition already existed that would not be terribly worsened by anything that would happen from the property [in question] . . . ." Walle, in commenting on the septic system designed for the lot in question, said that the impact on Frye Lake would be minimal and nonmeasurable *assuming* that the septic system functioned as intended and as it was described to function. Even if the system failed, he said that depending upon the time of year involved and if nutrients did get into the lake, the impact "on the total lake" would be "a very, very minimal amount." The reason for that was, he said, because there was "a tremendous amount of terrain for that septic effluent to traverse above surface and a lot of it would be taken up and used by the grass and by the bushes and low growing shrubs . . . ." Fairly viewed, such evidence involved not only the septic system itself, but the nature of the lot, including its soils and the proposed fill, the contours of the lot, and the proposals of both Breismeister and Risoli, both of whom testified extensively before Walle testified. The agency appeared knowledgeable of the locus itself. During the course of the hearing, the agency chair said of the locus, in speaking of the "delicate slope": "We have all walked down there and looked at it." Knowledge obtained through personal observations of the locus may properly be considered by the agency in arriving at reasons given for its denial. See *Manor Development Corporation* v. *Conservation Commission,* supra, 701; *Mrowka* v. *Board of Zoning Appeals,* 134 Conn. 149, 154, 55 A.2d 909 (1947). As Walle testified, there was talk of "eutrophication" of Frye Lake which Walle said meant "the process of a lake aging." The import of this and its implications engendered questions by the agency and the attorney for the neighbors. Walle, in his testimony, endeavored to point out that it was not a "negative

term." He testified that "[n]utrients do not migrate laterally on a body of water on their own" so that nutrients entering the cove of the lake would remain there unless somehow transported to another portion of the lake. A doctor who lived on Frye Lake for sixteen years and had been active in participating in its care for fifteen years, disagreed with Walle's opinion as to "lateral migration." Walle pointed out that while the water samples of the lake discussed were significant as to the cove area because "if you [want] to determine the impact on that cove you don't sample at the other end of the lake, you sample right there because the impact is not going to extend to the other end of this lake." Therefore, he frankly stated his opinion did not and could not reflect all the qualities of water in the lake.

The environmental engineering consulting report, commissioned by the neighbors and dated October 23, 1979, pointed out that "[a]ssuming satisfactory function[ing] of the [septic] system its use should not result in an increase of nutrients to the lake exceeding several percent. Once fully assimilated by dilution and mixing this minor increment will probably be undetectable by analytical means and have minimal effect on overall lake water quality." (Emphasis in original.) It also pointed out that "[d]ue to the shallow bedrock and extreme slopes on the property a system located there has an elevated risk of failure over a less difficult site." That report also remarked on the unsuitability of one area of the proposed system "due to the insufficient nitrate dilution and extreme grading difficulties." The same report refers to "a continuous layer of permeable soil" at one location.

We also note that at the very start of the hearing Michael A. Aurelia, administrator of the agency, made a statement during which he commented that "if the activities are authorized by the [a]gency [he] believe[d]

strict conditions should be prescribed to insure not only the proper construction of the septic system but, also, the implementation of necessary sedimentation and erosion controls . . . ." In addition, staff reports from agency experts, Aurelia, who holds a degree in geology and geological science, and Mark W. Lubbers, who holds a degree in biology, could be used to contribute to the substantial evidence supporting the denial. One lake resident, referring to a model of the proposed building at the public hearing, said that the edge of the deck of the proposed house was so close to the lake itself that a cigarette dropped from that deck would go "right down to the [lake] water." Although the plaintiff claims that the evidence shows that no pollution would result from the proposed activity, the record does contain evidence that there could be pollution. Evidence from the experts tended to show a potential of pollution. Evidence from a senior sanitary engineer of the water compliance section of the state department of environmental protection and from a consulting environmental engineering firm are examples. The plaintiff's professional engineer, Risoli, stated that he felt that the latter's report was "a very good report" and that "I think he knows what he's talking about . . . ." Moreover, Lubbers wrote a November, 1979 memo to agency members recommending a public hearing. In that memo, he not only indicated "that it appears that the proposals will not be adequate in preventing siltation of the watercourse," but given the nature of the lot as he described it, that with the prior existence of "some question that the [septic] system can be properly constructed . . . there is also the possibility of bedrock infiltration and contamination of ground water." In the memo, which referred to nine items which had been added to complete the application, including the Preiss-Breismeister erosion control plan, Walle's limnological evaluation of Frye Lake and

the consulting environmental engineer's report commissioned for the Frye Lake Association, Lubbers concluded that "[i]t is apparent from review of all the materials that the proposed development may well result in a significant impact or major effect on the regulated areas."

Sometime before the public hearing, the plaintiff forwarded, inter alia, a water quality report concerning Frye Lake. This report was to include not only a limnological description of that lake and certain water quality data, but an evaluation of the impact of the proposed activities on the water quality of the lake. The letter requesting the report specifically stated that "[c]onsideration should also be given to impacts of activities associated with living on the site (to include potential discharge of effluent from the Septic System)." This latter item, which is referred to in the agency's denial, was discussed at the hearing and evidence existed to support this. Of course, the agency also had the benefit of a view of the premises.

Without setting out everything in the record, we conclude that the record contained substantial evidence to support the agency's reasons to which we have referred. In *Aaron* v. *Conservation Commission,* 183 Conn. 532, 538, 441 A.2d 30 (1981), in speaking to the statutory scheme covering wetlands and watercourses, we said that "[a] statute should be interpreted according to the policy which the legislation seeks to serve." See also *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 57, 441 A.2d 68 (1981). In *Aaron,* we addressed the policies and purposes of General Statutes §§ 22a-36 through 22a-45 at some length and pointed out that "[i]n order to carry out [the] legislative concerns, [this legislation] expressly allows municipal regulation of wetlands and water courses" and that "the statutory scheme . . . envisages its adaptability to infinitely variable conditions for the effectuation

of the purposes of these statutes." *Aaron* v. *Conservation Commission,* supra, 539, 541. In order "to achieve the broader purposes of this [legislation]," the local wetlands agencies " 'shall serve as the sole agent for the licensing of *regulated activities*' . . . ." (Emphasis in original.) *Aaron* v. *Conservation Commission,* supra, 552; see General Statutes §§ 22a-42 (c), 22a-38 (13).

The legislative finding contained in General Statutes § 22a-36 provides, inter alia, that "[t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed. . . . The preservation and protection of the wetlands and watercourses . . . is in the public interest . . . . It is, therefore, the purpose of sections 22a-36 to 22a-45, inclusive, to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . preventing damage from erosion, turbidity or siltation . . . deterring and inhibiting the danger of . . . pollution; protecting the quality of wetlands and watercourses . . . by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn." This is a broad declaration of legislative purpose. Local inland wetlands bodies must look, inter alia, to this declaration in weighing their actions in any given case in which they may properly act. Applications such as that presented to the agency by the plaintiff illustrate the interrelationship of the specific regulations and statutes with the broad charter set by this legislative finding.

The discharge of the statutory responsibilities by local wetlands commissions may require commission members to reject "an otherwise acceptable application" because of its impact on the environment. *Obeda* v. *Board of Selectmen,* supra, 524. In this case, we need not go that far because there is substantial evidence to support the denial and the agency did not, as the plaintiff claims, "whimsically ignore substantial expert testimony" nor was its action "the result of the prejudicial desire of the [agency] to have [the] plaintiff's land remain in a natural state." It is important to remember that "[a]gainst [the] laudable state policy [of such legislation] must be balanced the interests of the private landowner who wishes to make productive use of his wetland." *Brecciaroli* v. *Commissioner of Environmental Protection,* 168 Conn. 349, 354, 362 A.2d 948 (1975). Local inland wetland bodies "are not little environmental protection agencies" as they have no authority to regulate any activity outside their jurisdictional limits. *Connecticut Fund for the Environment, Inc.* v. *Stamford,* supra, 250. This agency did not act in such a fashion but reasonably resolved fairly debatable questions based on substantial evidence.

"[A]n inland wetland agency is limited to considering only environmental matters which impact on inland wetlands." Id. Judicial review of the administrative process is designed to assure that administrative agencies act in a manner consistent with fundamental fairness. See *Feinson* v. *Conservation Commission,* supra, 429. This agency, unlike the commission in *Feinson,* so acted and it did not act arbitrarily on its own experience nor in disregard of contrary expert evidence. See id.

The plaintiff also claims that the agency's action resulted in the unconstitutional taking of her land. We do point out that, with reference to the taking claim, it is not clear from the record that there is not any other reasonable alternative residential use of this property

other than the proposed residence that was the subject of this application. The application that was denied was for a three-story, three-bedroom house with a two-car garage. The denied application, the plaintiff claims, was the "presentation of the *only feasible plan for residential use of the property.*" (Emphasis added.) It is not clear from the record that this is so. The trial court said that the agency "states there are alternatives, but [did not] articulate the alternatives to the plaintiff." Under the circumstances of this case, the trial court was in error here insofar as it placed the burden on the agency to demonstrate that there were alternatives in this case.[18] In *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 625, 153 A.2d 444 (1959), we upheld an agency denial of an application seeking a channel designation in tidal waters and to remove materials from that channel. What we said there bears repeating here: "The [applicants] asked for the designation of a *specific* channel as described in their application. It does not appear that they suggested or sought any alteration of the proposed channel whatsoever. They urged their plan as the only one feasible under all the circumstances. The commission denied it. The commission was not under a duty to make suggested changes or to grant a rehearing for that purpose. . . . It has simply denied access in the manner suggested in the application. The reason was a cogent one." (Emphasis added.) Id.; see also *Thompson* v. *Water Resources Commission,* 159 Conn. 82, 90,

---

[18] We note that not only does the plaintiff's brief assert that her presentation was "the only feasible plan for residential use of the property" but also that she affirmatively alleged in her complaint that "[t]here exists no reasonable, alternative use for the [plaintiff's] property from that proposed." Even if we assume, without deciding, the trial court was correct in imposing this burden on the agency, it is immaterial because the plaintiff by alleging this affirmatively assumes the burden of proving it. See *Walsh* v. *Turlick,* 164 Conn. 75, 82, 316 A.2d 759 (1972); *Blake* v. *Torrington National Bank & Trust Co.,* 130 Conn. 707, 709, 37 A.2d 241 (1944).

554

267 A.2d 434 (1970). Here the agency denied *the* application[19] presented and for cogent reasons.

There is error, and the matter is remanded to the trial court with direction to set aside its judgment and to affirm the decision of the agency.

In this opinion the other justices concurred.

[19] The agency's brief suggests that there may be "less destructive alternatives" for a house on the plaintiff's lot. It, however, is not clear to us from this record what such alternatives are, if indeed they exist.