[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff applicant, Raul Vega, is the owner of Las Vegas Cafe, a New Britain establishment which holds a liquor permit. After a May 11, 1993 hearing before the Department of Liquor Control ("DLC"), plaintiff's liquor permit was ordered revoked on the basis of three alleged incidents involving the cafe occurring in March, 1993. In a July 14, 1993, petition, plaintiff sought a reversal of the decision of the DLC and a stay of the revocation of his license. The stay was obtained. Plaintiff argues in this appeal that the notice provided to him in connection with the charges was defective. He argues further that the DLC's findings were not supported by the evidence. A hearing in this matter was held on January 26, 1994, at which Mr. Vega testified and oral argument was heard.
After considering the arguments put forth by the plaintiff, the court finds that the notice provided was adequate under all the circumstances. The court further finds that, with respect to one of the three incidents alleged, the DLC's findings are supportable under existing case law. Plaintiff's appeal is therefore denied for the reasons stated below.
I. Aggrievement.
Plaintiff must show aggrievement to have standing to bring this action pursuant to General Statutes 4-183. At the January 26, 1994, hearing, plaintiff provided testimony demonstrating that as the permittee and owner of the cafe, he is aggrieved by the DLC's decision. The DLC does not contest aggrievement. The court finds that Mr. Vega is aggrieved.
II. Factual Background.
A brief recitation of the facts contained in the record is necessary to an understanding of this appeal.
By a letter of January 28, 1993, the DLC informed Raul Vega that the Las Vegas Cafe's right to use a liquor permit was being suspended for 30 days. The January 28, 1993, CT Page 1129 letter recited three charges as the basis for the suspension: (1) that Raul Vega had permitted or suffered a gambling device to be upon the premises on February 7, 1992; (2) that Raul Vega had permitted or suffered unlawful conduct to occur on the premises on February 28, 1992, in that cocaine and heroin had been found on the premises; and (3) that he had permitted two minors to be on the premises unaccompanied by a parent or guardian, on June 21, 1992. The January 28, 1993 letter summarized the evidence in support of these findings that had been presented at public hearings on October 15, 1992 and December 8, 1992. Charges 1 and 2 specifically included language alleging that Vega had "suffered" the conduct being charged.
Subsequently, by an undated "Notice and Particulars," the DLC informed Raul Vega that he was being summoned to appear before the DLC on May 11, 1993, to answer new charges which form the basis of the instant appeal. The "Notice and Particulars" listed three separate charges, as follows:
INCIDENT 1
 Charge #1. On March 2, 1993, in the Town of New Britain you violated 30-6-A24(a) . . . in that you did by yourself, servant or agent permit a disturbance, brawl, unlawful conduct or gambling upon the permit premises and did permit the premises to be conducted in such a manner as to constitute a nuisance. AS MORE PARTICULARLY SET FORTH POLICE REFERRAL RECEIVED INDICATES THAT NEW BRITAIN POLICE OFFICERS ENTERED THE PREMISES AND FOUND PATRON IN POSSESSION OF NARCOTICS (COCAINE).
INCIDENT #2
 Charge #1. On March 20, 1993, in the Town of New Britain, you violated 30-91 . . . in that you did by yourself, servant or agent sell alcohol liquor after the hours of closing (2:45 a.m.).
 Charge #2. On March 20, 1993, in the Town of New Britain you violated 30-6-A24(a) . . . in that you did by yourself, Servant or CT Page 1130 agent permit a disturbance, brawl, unlawful conduct upon the permit premises and did permit the premises to be conducted in such a manner as to constitute a nuisance. AS MORE PARTICULARLY SET FORTH POLICE REFERRAL RECEIVED INDICATES THAT POLICE FOUND THE PREMISES TO BE SELLING ALCOHOL AFTER LEGAL HOURS. POLICE ALSO FOUND OPEN BEER BOTTLES AND CANS, ICE COLD, ON THE TABLES. DRUG PARAPHERNALIA WAS FOUND ON THE PREMISES.
Incident 1, Charge #1 and Incident #2, Charge #2 thus both charged Vega with "permitting" the alleged conduct, but did not charge him with "suffering" it. In this respect, these charges differed from two of the January, 1993, charges, which alleged that he had "suffered" the behavior complained of. Incident #2, Charge #1, charged Vega himself with engaging in the questioned conduct.
On May 11, 1993, a hearing was held at the DLC in Hartford before commission chairman William W. Sullivan and commissioners William B. Devine and Walter S. Brooks. Plaintiff appeared, representing himself. The full transcript of the hearing is part of the record.
Chairman Sullivan indicated that Mr. Vega's license had been suspended as a result of the January 28, 1993 finding as a consequence of previous charges, and stated that the earlier finding would be made a part of the hearing record. Transcript of May 11, 1993, DLC hearing, hereinafter "Tr.", at 3. Chairman Sullivan stated that the commission was "not prepared to ignore the fact that you have been before us before and that we found you've been guilty of other infractions in the not to (sic) distant past." Plaintiff replied that "I don't think that should be brought up again because you only get shot once," Tr. 4, which the court construes as an objection to the previous matter being considered at all during the proceeding. Tr. at 4. Chairman Sullivan then stated:
 Those other charges have no impact whatsoever in determining whether or not you're guilty of the present charges. However, I think you have to know that if you are guilty of the infractions that you are charged with, then it is reasonable for us CT Page 1131 to take into consideration the fact you do have a past record before this commission. We may take it into consideration and we may not, but in any event I'm going to make it a part of the record that we have it. Tr. at 3-4.
Testimony was then given by a number of New Britain police officers relating to the three charges against the cafe. Vega called as a witness Robert A. Dawkins, who testified to the circumstances surrounding his arrest at the cafe on March 2, 1993. Dawkins denied that Vega had known that he possessed cocaine. A number of law enforcement witnesses testified about events that occurred in the early morning hours of March 20, 1993, with reference to the charges pertaining to Incident #2. A representative of a community group spoke, expressing the view that the bar had a bad influence on children, and attracted people looking for drugs and off hours liquor. After the conclusion of the hearing, the commission adjourned to consider its decision.
By a notice of June 3, 1993, the DLC informed Vega that Las Vegas Cafe's liquor license had been revoked, and that renewal of the liquor permit was being denied.
The June 3, 1993, notice stated as follows in relevant part:
 THE DEPARTMENT FINDS REASON TO REVOKE YOUR PERMIT AND TO DENY YOUR RENEWAL THEREOF DUE TO THE FINDING OF VIOLATION IN INCIDENT 1, CHARGE #1; FURTHER, THE DEPARTMENT FINDS REASON TO REVOKE YOUR PERMIT AND TO DENY YOUR RENEWAL THEREOF DUE TO THE FINDING OF VIOLATION IN INCIDENT 2, CHARGE #1; FURTHER, THE DEPARTMENT FINDS REASON TO REVOKE YOUR PERMIT AND TO DENY YOUR RENEWAL THEREOF DUE TO THE FINDING OF VIOLATION IN INCIDENT 2, CHARGE #2.
By its very terms, the DLC notice made it clear that each incident, considered separately, provided an independent basis for the revocation ordered.
The June 3, 1993 notice continued to restate, essentially CT Page 1132 verbatim, the three charges that had been outlined in the earlier "Notice and Particulars" summoning Vega to the May 11, 1993 hearing, once again alleging that as to Incident #1, Charge #1, and Incident #2, Charge #2, Vega had "permitted" the questioned conduct to occur. The June 3, 1993, notice then continued to state as follows:
 THE DEPARTMENT OF LIQUOR CONTROL ("DEPARTMENT") CONDUCTED A PUBLIC HEARING ON MAY 11, 1993 ON A QUESTION OF WHETHER TO REVOKE OR SUSPEND RIGHT OF USE FOR CAFE LIQUOR PERMIT #3522 BECAUSE OF ALLEGED VIOLATIONS THAT OCCURRED ON MARCH 2, 1993 AND MARCH 20, 1993 AND ON A QUESTION OF WHETHER TO DENY OR ACCEPT THE RENEWAL OF PERMIT CA-3522.
 THE COMMISSION HEARD TESTIMONY FROM OFFICER KROZLIKOWSKI, OFFICER McCARTHY, OFFICER KENNEDY, OFFICER DURKIN, OFFICER BLEAU AND OFFICER SHELDRICK. THE OFFICERS ARE MEMBERS OF THE NEW BRITAIN POLICE DEPARTMENT.
 AS TO INCIDENT 1, CHARGE 1 THE COMMISSION FINDS FROM THE DIRECT TESTIMONY OF OFFICER KENNEDY AND OFFICER DURKIN THAT ROBERT DAWKINS WAS AT THE END OF THE BAR, NEXT TO RAUL VEGA, IN POSSESSION OF COCAINE PACKAGED FOR SALE ON MARCH 2, 1993. THROUGH A PREPONDERANCE OF EVIDENCE PRESENTED BY OFFICERS KENNEDY AND DURKIN THE COMMISSION FINDS THAT YOU, RAUL VEGA, PERMITTED THE UNLAWFUL CONDUCT OF ROBERT DAWKINS IN THAT YOU, RAUL VEGA ALLOWED HIM TO BE IN POSSESSION OF COCAINE PACKAGED FOR SALE, ON YOUR PERMIT PREMISES.
 AS TO INCIDENT 2, CHARGE #1 THE COMMISSION FINDS FROM THE DIRECT TESTIMONY OF OFFICER KROZLIKOWSKI (SIC) AND OFFICER BLEAU A PREPONDERANCE OF EVIDENCE TO FIND THAT ON MARCH 2, 1993 RAUL VEGA DID ALLOW THE CONSUMPTION AND PRESENCE IN GLASSES OR OTHER RECEPTACLES ALCOHOLIC BEVERAGES AFTER THE LEGAL HOUR OF SALE. ADDITIONALLY, THE COMMISSION FINDS THAT BAGGIES CONTAINING COCAINE CT Page 1133 WERE FOUND BY OFFICER BLEAU DURING THE INVESTIGATION OF MARCH 20, 1993. THE COMMISSION FINDS THROUGH THE PREPONDERANCE OF EVIDENCE THAT RAUL VEGA DID ALLOW UPON THE PERMIT PREMISES ILLEGAL CONDUCT.
 THE COMMISSION TAKES NOTICE OF ITS FINDING DATED JANUARY 28, 1993 AND MAKES THIS FINDING PART OF THE RECORD.
III. APPLICABLE LEGAL STANDARDS.
Before analyzing the specific arguments presented in this case, it would be helpful to review some of the general legal principles which must guide the court in its analysis.
Pursuant to General Statutes 4-183(j), "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," and "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced" in one of the six enumerated ways. The court's function is to determine "whether the commission acted so arbitrarily and unreasonably as to abuse its discretion." Williams v. Liquor Control Commission, 175 Conn. 409, 413 (1978). The credibility of witnesses and the determination of issues of fact are matters resting solely within the administrative agency's province. Id. So is the weight to be accorded to the evidence presented. Leib v. Board of Examiners for Nursing,177 Conn. 78, 84 (1979). The plaintiff has the burden of demonstrating that the agency's decision was in error. Lovejoy v. Water Resources Commission, 165 Conn. 224, 230 (1973). The commission's findings must stand "unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." Adzima v. UAC/Norden Division, 177 Conn. 107, 118 (1979).
In contested cases, "notice may be taken of judicially cognizable facts . . ." General Statutes 4-178(6). Ultimately, judicial review of administrative process is designed "to assure that administrative agencies act on evidence which is probative and reliable and act in a manner consistent with the requirements of fundamental fairness." Feinson v. Conservation Commission, 180 Conn. 421, 429 (1980). If there are multiple charges, an appeal will fail if any of the grounds for CT Page 1134 the agency's action are upheld on review. Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 539-40 (1987).
IV. PLAINTIFF'S CLAIMS
A. Failure to Give Advance Notice Relating to the Previous Suspension.
Plaintiff's first claim is that the DLC failed to give advance notice that it was going to consider its January 28, 1993 suspension finding at the May 11, 1993 hearing. Plaintiff relies upon General Statutes 4-178(7), which states in part that "parties shall be notified in a timely manner of any material noticed, including any agency memoranda or data, and they shall be afforded an opportunity to contest the materials so noticed . . ." Plaintiff also relies upon General Statutes 4-182(c), requiring that notice of an intention to revoke, suspend, annul or withdraw any license must inform the licensee "of facts or conduct which warrant the intended action." Plaintiff asserts that the case of Marshall v. DelPonte, 27 Conn. App. 346 (1992), supports his argument.
Plaintiff's argument fails for two reasons. First, the previous suspension was not considered for the purpose of determining whether Vega was culpable with respect to the charges aired at the May 11, 1993, hearing. As noted above, Chairman Sullivan clearly stated that the previous matter would be considered with respect not to whether violations had occurred, but with respect to the possible penalty only, which was determined following the completion of the hearing. See Leib v. Board of Examiners for Nursing, supra, at 83-85. This court must presume that the DLC acted in accordance with the chairman's stated intentions. Brecciaroli v. Commissioner of Environmental Protection, 168 Conn. 349, 356 (1975); Welch v. ZBA, 158 Conn. 208, 214-15 (1969). Plaintiff cites no cases in support of the proposition that the notice requirement compelled the DLC to give advance notice of all matters upon which it might rely in evaluating an appropriate penalty. The undated hearing notice summoned plaintiff pursuant to General Statutes30-55, which specifically listed revocation as one of the available sanctions. Plaintiff thus was on notice as to the available sanctions which he faced. Having been penalized by the same commission only four months previously, plaintiff's claim that he was unprepared for the possibility that the commission would consider his previous suspension history is unpersuasive. CT Page 1135 Moreover, he was given a full opportunity to argue his case on this issue.
Second, the commission had it within its power to take notice of the previous suspension pursuant to General Statutes4-178(6). Chairman Sullivan was saying the obvious when he stated that the DLC was not dutybound to ignore the plaintiff's recent history with the commission insofar, as it impacted on what penalty might be imposed. Our Supreme Court has recognized, even in the more stringent context of criminal proceedings, that "trial judges ought not to be reprimanded for acknowledging on the record the impact of information they have gained in the plea bargaining or sentencing processes unless the use of such information confounds reason and a just result." State v. Huey, 199 Conn. 121, 128 (1986). The situation presented here is roughly, if not precisely, analogous. Plaintiff's argument on this point would rewrite the old adage that "justice should be blind" into a new adage that commissions such as the DLC should blind themselves to what they themselves have done, to what is a matter of public record, and to what is well known to a litigant. The court discerns no injustice in the DLC's failure to give advance notice to plaintiff that it would consider the earlier, recent suspension in determining a sanction. Indeed, the record indicates that the earlier suspension, for a period of 30 days, was to commence on or after January 28, 1993. Thus, it was to remain in effect until at least late February, only days prior to the March 2, 1993, incident which formed the basis of the first of the instant the instant charges.
Plaintiff's reliance on Marshall v. DelPonte,27 Conn. App. 346 (1992) is misplaced. In that driver's license suspension case, the court found error where a department of motor vehicles commissioner had arguably relied on his own expertise, or taken judicial notice of the plaintiff's blood alcohol content, in reaching a determination that the plaintiff had driven while intoxicated. Marshall thus stands for the narrow proposition that an agency may take judicial notice of contested evidentiary matters only if it provides advance notice to the party affected of its intention to do so. It does not stand for the broad proposition, advanced by plaintiff, that in arriving at a sanction an agency or commission cannot take judicial notice of the recent disposition of a matter of public record, involving the same litigant, as to which the applicant clearly has knowledge. This court ought not to engage CT Page 1136 in a "microscopic search" for technical infirmities in an agency's actions. Jones v. Civil Services Commission,175 Conn. 504, 511 (1978). Plaintiff's argument is rejected.
B. The Three Incidents.
Incident #1, Charge #1, related to the possession of cocaine by Robert Dawkins, who was a patron of the cafe on March 2, 1993. The DLC's June 3, 1993, notice of revocation stated that Officers Kennedy and Durkin had observed Dawkins at the end of the bar, next to Raul Vega. Hearing testimony established that Dawkins was searched and that cocaine, arguably packaged for sale, was seized from him.[1] At the hearing, Dawkins testified, denying that Vega knew he had cocaine on him.
Issues of witness credibility are of course to be determined by the DLC commissioners. Cf. Manor Development Corporation v. Conservation Commission, 180 Conn. 692, 697
(1980). Even if Dawkins' testimony is disbelieved in its entirety, the court's review of the record reveals little from which a logical inference could be drawn that plaintiff actually knew that Dawkins was in possession of cocaine or any other contraband. Dawkins testified that he had no previous record, which testimony is uncontradicted. There is thus no clear evidence in the record that Vega knew that Dawkins was in possession of cocaine or could have been known as a drug dealer. The fact that plaintiff may have been in close physical proximity to Dawkins at the bar provides no basis for drawing the inference that Vega knew Dawkins possessed cocaine, whether for sale, or otherwise. Officer Kennedy did testify that a confidential informant provided information that an individual in the bar was in possession or cocaine. Tr. at 6. Officer Kennedy also testified that the confidential informant provided information that the suspected individual was actually selling drugs from within the bar, although he conceded that this information relating to sale was not in his report. Tr. at 11. Nowhere did Officer Kennedy testify, however, that the confidential informant had provided information that the possession or sale of illegal substances was observed by Vega or known to Vega. The hearing testimony thus provides no credible, probative evidence from which to conclude that plaintiff had knowledge that Dawkins possessed cocaine.
The DLC argues, however, that there need be no showing CT Page 1137 that Vega had actual knowledge that Dawkins possessed cocaine. Citing the regulation 30-6-A24, which provides that no permittee shall "allow, permit or suffer" certain activities, the DLC argues that, in light of all the attendant circumstances, including his past history, Vega "suffered" Dawkin's activities and that this provides a basis for a finding of culpability as to this incident. In support of this position the DLC relies heavily upon the case of Guastamachio v. Brennan, 128 Conn. 356 (1941).
In Guastamachio, the Supreme Court reviewed the decision to suspend for eight weeks the liquor license of a permittee who had permitted a substitute permittee, one Lang, to run his restaurant for the night. Without advance knowledge or approval of either the original or substitute permittee, "five girls entered the hall upstairs and there engaged in an immoral performance in the presence of the men attending the dinner," Id. at 357, until the state police arrived to arrest the performers and Lang. The applicable regulation pursuant to which the eight week suspension had been ordered read as follows:
 Conduct of Permit Premises. No permittee shall allow, permit or suffer in or upon the permit premises any disturbances, lewdness, immoral activities, brawls, or unnecessary noises, or allow, permit, or suffer the permit premises to be conducted in such manner as to become a nuisance. (A permittee will be held strictly accountable for the conduct of his permit business, and nuisances will not be tolerated.)
The court framed the issue as whether or not the performance could be construed to violate the regulation in the absence of actual knowledge or negligence by the permittee or substitute permittee. Id. at 358. The court ruled that it could, finding that the use of the word "permit" — which suggested affirmative action — alongside the word "suffer" — which suggested passivity — led it to conclude that knowledge on the part of a permittee was not required within the meaning of "suffer" as it was employed in the statute. Id. at 359. The court relied heavily on the language of strict accountability set out in the regulation in reaching its conclusion.
In the instant case, similar language of strict accountability CT Page 1138 is not set out in the very portion of the reglation [regulation] Vega is accused of having violated, but is found elsewhere in 30-6-A24(i) of the regulations, which states: "A permittee will be held strictly accountable for the conduct of his permit premises." 30-6-A24 itself states that the prohibited activities shall not be "permitted or suffered" on the premises. There are factual distinctions between the scenario presented in Guastamachio, decided more than half a century ago prior to the development of modern concepts of due process, and the instant case. In Guastamachio, the dancers were invited onto the premises to do the very act deemed immoral, an act performed openly upstairs, and the sanction was suspension. In the instant case, Dawkins was not invited onto the premises to perform an illegal act and the conduct resulting in his arrest — the possession of cocaine. However, notwithstanding these distinctions, until and unless our Supreme Court revisits the issue raised half a century ago in Guastamachio, this court is bound to apply it as the law.
Had the DLC charged Vega with "suffering" as well as "permitting" the conduct alleged under Incident #1, Charge #1, and Incident #2, Charge #2, therefore, the DLC's argument would prevail. However, as noted above, in its undated "Notice and Particulars," the charging document in this case, the DLC did not charge that Vega "suffered" the conduct alleged. It charged instead that he "permitted" the conduct. The court is sympathetic with the argument that to laypersons, the difference between charging a permittee with "suffering" conduct as opposed to charging a permittee with "permitting" the conduct may seem to be a distinction without a difference. But such subtle distinctions are often at the heart of a court's analysis of a statute, a contract, a lease, or a constitution. And as Guastamachio demonstrates, the words "suffer" and "permit" are not synonymous in the context of the DLC's acting on licensing decisions. But see State v. Poplowski, 104 Conn. 493
(1926). The DLC had the opportunity to allege that Vega had "suffered" the alleged conduct in the instant case, as it had done in connection with the January, 1993, charges. Having foregone the opportunity to charge plaintiff with having "suffered" the conduct alleged against him in the instant case, the DLC cannot now argue that the court should apply the lesson and logic of Guastamachio to uphold the revocation in the absence of any evidence that Vega had knowledge that Dawkins possessed cocaine. Cf. Koval v. Liquor Control Commission, 149 Conn. 63,65 (1961). CT Page 1139
Similar analysis applies with respect to the DLC's finding as to Incident #2, Charge #2, insofar as it relied upon the claim that "drug paraphernalia" was found on the premises.[2]
The record reveals nothing indicating that Vega knew that this drug paraphernalia was present. Once again, as to this incident, the DLC's undated "Notice and Particulars" charged that Vega "permitted" the alleged conduct, not that he also "suffered" it. For the reasons stated above, the court concludes that under Guastamachio, the DLC's finding as to Incident #2, Charge #2, cannot stand in the absence of an allegation that Vega "suffered" the presence of the illegal substances at the cafe.
This court's approach is consistent with the analysis used by Judge Stengel in Koch v. Department of Liquor Control, Superior Court, Judicial District of New Haven at Meriden, Docket No. CV 91-0239234S (June 29, 1992). In Koch, the DLC charged the permittee with allowing an intoxicated person to loiter on the premises, although there was no evidence that the permittee actually knew the intoxicated patron was still on the premises. The DLC in that case also relied on the argument that the permittee had "suffered" the conduct at issue. Analyzing the case under the distinctions established in Guastamachio, Judge Stengel noted that the permittee had been charged with "permitting" the conduct charged, not with "suffering" it, and sustained the appeal from the DLC's suspension of the permittee's liquor permit.
This court is sensitive to the limitations placed on its discretion in reviewing the DLC's conduct and does not seek to substitute its judgment for that of the commissioners. However, viewing the facts in light of the applicable law and the charging language used by the DLC, this court cannot conclude that there was sufficient credible and probative evidence before the DLC to sustain its ruling on the basis of Incident #1, Charge #1, and Incident #2, Charge #2, and therefore finds that the DLC's findings as to those two charges are clearly erroneous.
With respect to Incident #2, Charge #1, however, no similar ambiguities exist. Incident #2, Charge #1 alleges that Mr. Vega himself sold alcohol after closing hours. Officer Krozlikowski testified clearly that he saw Vega sell a beer to a patron after closing hours. Tr. at 28, 31. He also stated that he encountered open alcoholic containers and glasses of CT Page 1140 beer. He reaffirmed this testimony under cross-examination by plaintiff. Tr. at 32-35. As noted above, matters of weight and credibility lie solely within the province of the agency. The DLC had a clear factual basis to find that Vega had sold alcohol after hours as charged. As stated above, this violation alone provided a basis for the DLC's decision to revoke plaintiff's license.
Defendant claims prejudice because the June 3, 1993, notice outlining the reasons for the revocation as to Incident #2, Charge #1 varies somewhat from the charges upon which the DLC relied in its June 3, 1993, letter of revocation. Specifically, as to Incident #2, Charge #1 — which alleges sale of alcohol by Vega — the revocation notice states that Vega allowed the consumption and presence after hours of alcoholic beverages in glasses or other receptacles Vega relies on the case of Venuti v. Liquor Control and McNally, 10 Conn. L. Rptr. No. 3, 61 (October 25, 1993), in support of his claim. In that case, Judge Maloney found that a notice of hearing which accused the licensee of violations occurring on March 25, 1992 was defective when the evidence produced at the hearing related to events which occurred on a different date, March 21. In his ruling, Judge Maloney cited 4-182(c) of the UAPA, which provides that "No revocation, suspension, annulment or withdrawal of any license unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action. . ."
Plaintiff's objection on this issue is unpersuasive. Aside from the fact that sale of alcoholic beverages in many instances carries with it a reasonable inference that the alcoholic beverages are being consumed and are present, the undated notice form clearly informed plaintiff that he was being charged with sale and also with allowing the consumption and presence after hours of alcoholic beverages in glasses or other receptacles. Vega was given notice of the facts and conduct which warranted the DLC's actions. The hearing testimony established both the sale charge, as noted above, and the charge that he had indeed allowed the consumption and presence after hours of alcoholic beverages in glasses or other receptacles.
Moreover, the notice and the evidence adduced as to Incident #2 all related to events occurring within a short period of time on the same date: March 20, 1993, thus distinguishing Venuti. Under all the circumstances, any claim that CT Page 1141 plaintiff was not properly informed of which "facts or conduct" which warranted the intended action of the DLC is unpersuasive. Pagano v. Board of Education, 4 Conn. App. 1, 6-7 (1985). Vega's claim that the notice was defective asks the court to engage in the sort of microscopic analysis that should be eschewed in evaluating claims of this sort. Jones v. Civil Service Commission, supra.
Summary and Conclusion
Notwithstanding the court's finding that the DLC's action was clearly erroneous as to its findings relating to Incident #1, Charge #1, and Incident #2, Charge #2, a review of the whole record persuades the court that the DLC did not abuse its discretion in revoking plaintiff's permit. A review of the record satisfies the court that he was given notice of the charges against him, understood the charges against him, and was permitted to prepare to meet these charges. The charge relating to Incident #2, Charge #1, was supported by credible and probative evidence. The decision to revoke was expressly based on a finding on that charge, independently.
For these reasons, and the reasons stated above, the appeal is denied.
DOUGLAS S. LAVINE JUDGE, SUPERIOR COURT