[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Absalom Kofman is the owner of a 24 acre piece of property located on Ashley Road in Winchester, Connecticut. 9.9 acres, 41% of the site are wetlands. Mr. Kofman submitted a wetlands application on March 11, 1994 for three wetlands crossings for a five lot subdivision. After four meetings, including two public hearings, the Inland Wetlands Agency for the Town of Winchester denied his application.
Mr. Kofman then submitted a second application on August 11, 1994 for the same parcel of land. The second application contained two wetlands crossings and proposed four lots. The Inland-Wetlands Commission turned down this application after consideration at four meetings and accepting testimony at two public hearings. From this denial the Plaintiff has appealed.
This appeal was brought under Conn. Gen. Stat. § 22a-43. The courts have held that such an appeal is governed by the Uniform Administrative Procedures Act, Connecticut General Statute Section4-183. Klug v. Torrington Inland Wetlands, 1992 CT CaseBase 245 (January 24, 1992), Superior Court, Judicial District of Litchfield (Pickett, J.); Fuller, Land Use Law and Practice, p. 581-589 (1993).
Connecticut General Statutes 4-183 (j) provides:
 The courts shall not substitute it s judgment for that of the agency as to the weight of the evidence and questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of CT Page 12250 the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedures; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, prohibitive and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
It is the burden of the plaintiff to establish that the record does not support the action of the agency. Red Hill Coalition,Inc. v. Conservation Commission, 212 Conn. 710, 718 (1989). The courts have consistently held that the proper standard in reviewing an inland wetlands decision is:
 The agency's decision must be sustained if an examination of the record discloses evidence that supports any of the reasons given. (Citations omitted.) The evidence, however, to support any such reason must be substantial; the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. (Citations omitted.) . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525, 541-542 (1987).
Substantial evidence has been deemed to be similar to the sufficiency of the evidence standard for judicial review of jury verdicts:
 . . . [E]vidence is sufficient to sustain the agency finding if it affords a substantial basis of fact from which the fact and issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . [It] imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of CT Page 12251 review than standards embodying review of `weight of the evidence' or `clearly erroneous action'". Huck v. Inland Wetland and Watercourses Agency, supra 541, citing Lawrence v. Kozlowski, 171 Conn. 705, 713-714 (1976).
The courts have held that the agency's decision should be given great deference. The court's role is of limited scope. The reviewing court does not make a broad de novo review of the application. Huck v. Inland Wetlands and Watercourses Agency,
supra at 541; Bell v. New Milford Inland Wetlands Commission, 1992 CaseBase 2582 (March 17, 1992), Superior Court Judicial District of Litchfield, Pickett, J. It should not revisit factual issues or weigh the credibility of witnesses. The court only looks to review the evidence in the record and upholds the decision if the record reveals substantial evidence in support of any reason given. Huckv. Inland Wetlands and Watercourse Agency, supra 539, 540.
The plaintiff claims that the defendant agency placed no reasons for its decision on the record. A review of the transcript of the November 16, 1994 meeting at which the agency denied the application shows the agency set out its concerns with the poor drainage, the extent of the wetlands on the lot and the potential for runoff if all four lots are built upon:
 Terrence Smyth: ". . . many of the areas that he says are not wetlands and by soil type and vegetation I am sure he is correct, however, when I walk through them, you know, I get back to the truck and my feet are soaking wet." (T. November 16, 1994, p. 1-2)
 Patricia Mills: "I would just like to state that I was up there. And I also found that it was very, very wet and I went right through several spots and I would have to agree with Terry, the area is very wet." (T. November 16, 1994, p. 2)
 Terrence Smyth: ". . . my concern comes up with that any work done here — a chance for erosion, siltation and something down this way." (T. November 16, 1994, p. 2)
 Nancy Cannavo: "You will have additional runoff though coming down when trying building." (T. November 16, 1994, p. 3)
The insertion of section 10.2e and 10.3 of the Town of Winchester CT Page 12252 Inland Wetland regulations into the record supports the agency's finding that the reasons found for the denial are proper criteria under the agency's regulations to support its decision.
The courts have long held that failing to provide any reasons in an administrative agency's decision is not fatal. Gagnon v.Inland Wetlands and Watercourses Commission, 213 Conn. 604, 607-609
(1990). If the reasons supporting the decision are insufficient the court must search the record to find evidence supporting the decision. ". . . [I]f any reason culled from the record demonstrates a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld. Parks v. Planning and Zoning Commission, 178 Conn. 657,661-662 (1979); Bell v. New Milford Inland Wetlands Agency, supra. A review of the entire record supplies evidence to support the denial of the plaintiff's application.
In reviewing the record, it is appropriate for the court to examine both applications that were denied. Tarasovic v. ZoningCommission, 147 Conn. 65, 71 (1959). From the point of the first application in March, 1994 until November, 1994, when the second application was denied, the defendant Agency was concerned with the ability of the 24 acres to support a four or five lot subdivision given the fact the lot was awash in wetlands, and even the area designated non-wetland soils was so wet it often had standing water on it.
The plaintiff argues that the only fact at issue should be the two wetland crossings. However, an inland wetlands agency must look not just at the wetland area but also the effect on the wetlands by activities outside the wetland area. The court in Aaron v.Conservation Commission, 183 Conn. 532, 542 (1981) stated ". . . [A]n examination of the act reveals that one of its major considerations is the environmental impact of proposed activity on wetlands and watercourses, which may, in some instances, come from outside the physical boundaries of a wetland or watercourse." The court held that activity that occurs in a nonwetlands area, but affects wetland areas, falls with the scope of regulated activity and is subject to an inland wetlands agency jurisdiction. See alsoCioffoletti v. Planning and Zoning Commission, 209 Conn. 544
(1989).
Initially the applicant did not supply information showing the percentage of wetlands on each lot. After a request from Commissioner Arquette a breakdown was provided that showed as CT Page 12253 follows:
Lot Acres of NonWetlands Acres of Wetlands Total Acres ------------------------------------------------------------------------ 1 3.0 2.6 5.2 2 3.7 2.1 5.8 3 3.3 3.1 6.4 4 4.3 2.2 6.5
Supplemental Return of Record, page 2 of Site Development Ashley Woods subdivision.
The court will note that lots 1 and 3 are almost 50% wetlands. This information was a concern to the commission. See Appendix A.
Despite the commission's obvious focus on runoff and the affect runoff would have on the extensive wetlands, the applicant presented no expert testimony to refute the commission's concern. Indeed, the record is replete with the expert's testimony of the high water table, poorly drained soils, and the saturated nature of much of the lot. See Appendix B.
The plaintiff's own expert also supported the agency's concern with the poorly drained nature of the soil.
 Wesley Woodin (member of public): ". . . basically the area is just above wetland."
 Bruce Laskey: "The majority of the area but there are, you have two other grades in there too." (T. October 19, 1994, page 3)
 Pat Hackett: "Yes, we know that there is a high water table and that goes along with being a woodbridge soil." (T. October 19, 1994, page 6)
Plaintiff's own experts agree that runoff would increase from development.
 Pat Hackett: "Anytime you change land use, you normally increase. . . . In this situation if, I would say right now it is probably in the area of maybe 4% and using that off the top of my head." (T. June 15, 1994, page 11) CT Page 12254
Although plaintiff maintains the engineer Pat Hackett provided expert testimony on the anticipated increase in runoff from development; in fact Mr. Hackett acknowledged any such estimate was pure guesswork:
 Pat Hackett: "In the original application was submitted Hydrology Hydraulics. The hydrology being estimating how much runoff you would have in a normal storm taken into consideration the size of the watershed the time to takes for the water to concentrate at this proposed culvert location and some sort of runoff characteristic typical of this type watershed. Based on that we come up with a certain runoff or a certain return frequency storm. A fancy word of saying. . ."
Wes Woodin: "It's a guess."
 Pat Hackett: "It's a probability. It's an estimate. How's that. It's an education guess." (t. May 18, 1994, page 21)
 Patricia Wass: "With the houses and driveways as proposed, what is the increase in runoff that you would expect?"
 Pat Hackett: "Anytime you change land use, you normally increase. . . . In this situation if, I would say right now it is probably in the area of maybe 4% and using that off the top of my head." (T. October 19, 1994, page 11)
The agency heard testimony from neighbors relating the extensive problems resulting from the high water table in the area and the inability of the soil to handle water. Public Hearing Record, May 18, 1994, June 15, 1994 and October 19, 1994, finally, in addition to the information obtained from plaintiff's engineers and the public, at least four Commission members visited the site.
William Arquette: "Have you been up there Scott?"
Scott Eisenlohr: "Yes, I have."
 William Arquette: "I think Nancy has been there in the past."
Pat Mills: "I have been there." CT Page 12255
 William Arquette: "And there is many of us in a group that have gone up. "
 Nancy Cannavo: "Even a couple of times." (T. May 18, 1994, pages 16-17)
 Terrence Smyth: ". . . many of the areas that he says are not wetlands and by soil type and vegetation I am sure he is correct, however, when I walk through them, you know, I get back to the truck and my feet are soaking wet." (T. November 16, 1994, pages 1-2)
 Patricia Mills: "I would just like to state that I was up there. And I also found that it was very, very wet and I went right through several spots and I would have to agree with Terry, the area is very wet." (T. November 16, 1994, page 2)
An agency is entitled to take into consideration any fact which may have been learned through personal observation. Kaeserv. Conservation Commission, 20 Conn. App. 309, 316 (1989). This is especially significant with something so obvious as the ability of the soil to drain rainwater.
A review of the entire record reveals more than ample evidence to support the agency's denial.
Plaintiff states that all the experts, including the defendant's expert, supported the plaintiff's application. A review of the testimony set out above shows the invalidity of such an argument. The defendant's engineers did review the plan and recommend changes which the plaintiff made. However, the defendant's engineer also recognized the drainage problems on the site by recommending plaintiff only be allowed to construct wetlands crossings during July and August. (See Return of Record WMC letter, August 25, 1994).
Connecticut courts have held that an agency need not be bound by expert testimony. "An administrative agency is not required to believe any witness, even an expert, nor is it required to use any of the evidence presented to it in a particular manner."Laufer v. Conservation Commission, 24 Conn. App. 708-717 (1981). Indeed in Laufer the Commission did not follow its own staff advice. "While the agency may seek advice and assistance from a CT Page 12256 professional staff, it is the agency itself that must find the facts and apply the statutory criteria to these facts. To adopt the plaintiff's argument would negate these long standing rules of administrative procedure, and would constitute an unlawful delegation of powers." Laufer v. Conservation Commission, supra 714. Therefore the agency was well within its power to place whatever emphasis on plaintiff's expert that they deemed fit and use its own expert's report to require modifications to the plaintiff's application but not be the deciding factor in its decision.
In Huck v. Inland Wetlands and Watercourses Agency, supra, 525, the plaintiff had appealed a denial of an application for a permit for construction of a single family house on property bordering a watercourse. The plaintiff argued the denial should be reversed because the agency disregarded four different experts supporting plaintiff's application, no evidence was submitted to rebut the favorable reports and the agency's own staff report was substantially complied with. The agency also provided no reason for the denial. The Supreme Court upheld the agency's decision based upon consideration similar to the present case. The court looked to the questioning of the plaintiff's experts by the agency and concessions made by the experts as to the problems with the lot. Huck, supra 546. The agency members knowledge of the site was given weight, as well as testimony of the neighbors. Huck v.Inland Wetlands and Watercourses Commission, supra 547-548. As discussed earlier, the Winchester Inland Wetlands Agency based its decision on similar grounds.
Similarly the agency decision in Manor Development Corporationv. Conservation Commission, 180 Conn. 692 d(1980) was upheld based upon the agency's finding that overdevelopment in wetlands created problems, and its finding that seven lots were "totally in wetlands". The court held, "taken together these two `reasons' are sufficient basis to deny the application when the language of the enabling statute is considered." Manor Development Corporationv. Conservation Commission, supra 700. The record in the present case also shows the commission's concern with over-development and building lots located in wetlands.
The plaintiff argues that the absence of a transcript for the public hearing on September 21, 1994 and the unintelligible testimony for some witnesses "constitutes an injustice to the plaintiff." Inland wetland commissions are under no statutory duty to record their public hearings. Fuller, supra 508-509. The proper CT Page 12257 remedy for a lost or defective transcript is to have a witness testify before the trial judge as to what occurred at the public hearing on the application. Lathrop v. Planning and ZoningCommission, 164 Conn. 215, 219-221 (1973); C.G.S. Section 8-8k;Fuller, supra 502. In Kaiser v. Zoning Board of Appeals ofStratford, 218 Conn. 438 (1991), the board's recording equipment malfunctioned and the trial court permitted evidence as to what had transpired at the public hearing.
The plaintiff argues that the denial of the four lot subdivision constitutes a taking of his property which will entitle him to compensation under the Fifth Amendment to the United States Constitution and Article I Section 11 of the Connecticut Constitution.
A determination whether the decision of the defendant agency is confiscatory requires a trial de novo, in addition to a consideration of the administrative record. Cioffoletti v.Planning and Zoning Commission, 209 Conn. 544, 551 (1989). The review cannot be decided simply on plaintiff's brief.
The plaintiff's claim that the agency confiscated his property without compensation is without merit, since the plaintiff has submitted an application for a four or five lot subdivision and there is no indication on the record whether a three or two lot subdivision would be approved by the Inland Wetlands Agency. The Appellate Court has stated:
 The test for determining whether a taking has occurred cannot be resolved on the basis of the denial of a single application . . . or even the denial of multiple applications. Instead, the reviewing court must first establish that there was a final authoritative decision by a commission and then conduct a two pronged taking analysis.
Hoffman v. Inland Wetlands Commission, 28 Conn. App. 262, 268-269
(1992) citing Gil v. Inland Wetlands Agency, 219 Conn. 404 (1991). It is the plaintiff's burden to prove that he has be deprived by the agency of the use of his property. Hoffman v. Inland WetlandsCommission, supra 268. The plaintiff must show that the rejection of the current application indicates that the agency would not accept a "less ambitious" use of the property than that proposed by the applicant. Hoffman v. Inland Wetlands Commission,
supra 269. There is no indication in the record that the CT Page 12258 Winchester Agency would not accept any other use of the property. Therefore, plaintiff's claim of a taking must fail.
The Town of Winchester Inland Wetland Watercourse Agency's decision was set out at the time of its vote. Its concerns with the extent of wetlands, the poor drainage and the effect development would have on wetlands and the neighbors' property is set out in the record and is supported by the plaintiff's expert and the agency members own inspection. A review of the entire record supports the agency's decision. For the reasons stated, the appeal is denied.
PICKETT, J.
APPENDIX A ----------
William Arquette: "Lot 1, Larry, is almost 1 to 1 — wetlands affected to non-wetlands. It is 2.5 versus 2.7. Lot 3 is 3.1 versus 3.3 — again you are almost 50%." (T. June 15, 1994, page 7)
Terrence Smyth: "To me there is one too many lots at least on here. That is just looking at the way the wetlands are, what we have to do to access special needs for the wetlands." (T. March 16, 1994, page 3)
Nancy Cannavo: "That is quite a bit of wetlands. I know Steve McDonnell (engineer for the Defendant) is very concerned about the fact that there is a lot of wetlands out there and they haven't been flagged. Cause I had spoken to him about that and there was a lot of fill that would be required." (T. April 20, 1994, page 5)
William Arquette: "I just want to point out something that still bothers me. We've got a total area of 24 acres. We got a wetlands of 9.9 acres. We are talking about with my quick arithmetic here 41% coverage in wetlands and I would still question whether five lots is appropriate and if it was to be reduced if we could have less of an impact on the wetlands (unintelligible). . . . What I am talking about is a piece of property that may or may not be commendable to this kind of development considering the fact that 41% of it is wetlands. That is one of my concerns." CT Page 12259
Nancy Cannavo: "I agree with you, that has been my concern too." (T. May 18, 1994, page 23)
Nancy Cannavo: "Because my biggest concern at this point is just, cause the amount of water that is already there when you do have more water when you have the building, just what is going to happen to all that water, all that run off, and I think that, in my opinion, I think that is going to be a problem." (T. June 15, 1994, page 3)
Nancy Cannavo: "Right, oh yeah, my opinion, is that I think there are too many houses on this — subdivision. I agree, I think that is one of our concerns and we need to take a look at." (T. June 15, 1994, page 8)
William Arquette: "My other concern is what was brought up here tonight — is not only what is going to happen to the people surrounding the area of property but what is going to happen to people who come along to buy this property to build on. . . . I am looking from a stand point of looking out for the well being of the surrounding property owners, and the inland wetlands and the rest of it would be to watch out for the well being of the person that might come along and buy one of these lots and try to build a house on it." (T. June 15, 1994, page 9-10)
Nancy Cannavo: "I also feel that despite the reports — just the impact when you start seeing the driveways and tarring of the driveways and just all of the excess run off — I mean that it is so wet now where is this extra water going to be going — I am concerned about that." (T. June 15, 1994, page 10)
 APPENDIX B ----------
Pat Hackett (Plaintiff's engineer): "So the soils in the back aren't very well drained as compared to the front and the middle section is wetlands. . . . It is very difficult when you are in there to distinguish the wetlands from the non-wetlands in that front section." (T. March 16, 1994, page 2)
Nancy Cannavo: "Because that property is very wet." CT Page 12260
Pat Hackett: "Yes. The front is, the back is very well drained but the front along the road there is no question." (T. April 20, 1994, page 3)
Bruce Laskey (Plaintiff's soil scientist): "Those soils will have a water table during the wet part of the season much closer to the soils surface. It could be around 1 . . . to 12 inches or so. . . . This gentlemen is correct that everything is wet out there. But the soils are, I feel, are correctly delineated. . . . I would imagine that this was pretty well saturated. Along the entire segment of the property are pretty well saturated from the heavy snow cover that we had this winter and the rains that we have had continuously from the early Spring through now. . . . You will tend to get a lot of tree throws in there where, this is the whole landscape in that area is dominated by that as a result you get a pocketed effect you don't have any free surface flow of water. (T. May 18, 1994, page 4)
Bruce Laskey: "I was there after a heavy rain and it was soft and squishy." (T. May 18, 1994, page 5)
Bruce Laskey: "Well because of that I can just say in generalities because of the hard pan type soil you would have to have a designed system. . . . the depth of the mottling which in this area is shallow. Normally in a moderately well drained soil in a hard pan the lowest depth is probably about 18 inches. But because we have somewhat poorly drained soils associated with that you can have mottling at 10 inches. . . . They have to fit in an area where the water table tends to be deeper even though these aren't wetland soils a lot of this area is not suitable for sanitary sewers." (T. May 18, 1994, page 5)
Bruce Laskey: "Now I was out there after a heavy rain and if I would map everything by wetness, then I would have just walked off the site because everything was wet even the uplands were wet." (T. May 18, 1994, page 6)
Bruce Laskey: "But I mean that right now everything is wet." (T. May 18, 1994, page 7) CT Page 12261
Pat Hackett: "I can imagine after the three inches of rain we had last night that any of these small little gullies are filled and are percolating down to time. There is no question that the area proposed for septic system are going to require grading and a curtain drain but it would still be able to function." (T. June 15, 1994, page 2)
Bruce Laskey: "At sometimes during the year and early spring if the soils are saturated and we get a heavy rain or we had a lot of snow like we did this past winter, you can have a water table for brief periods of time and that could be close to the surface for a short period of time then the soils will drain and average out to about an 18 inch level." (T. October 19, 1994, page 2)