[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from the action of the defendant, Conservation Commission/Inland Wetlands and Watercourses Agency of the Town of Simsbury (hereinafter "Commission") denying the application of the plaintiffs River Bend Associates, Inc. and Griffin Land Nurseries, Inc., (hereinafter "River Bend") for an Inland/Wetlands permit filed on May 19, 2000 for approximately 363 acres on which River Bend proposed to build 371 residential houses. Said denial was by motion adopted by the commission on July 19, 2000. The proposed development is known as "Meadowood" and is located on premises in the Town of Simsbury bounded by Hoskins Road on the South, County Road on the Northeast, Firetown Road on the South and Holcomb Road on the West as more fully shown on a Site Location map dated July 14, 1999 submitted by Connecticut Ecosystems LLC.
The original application for a permit was dated November 9, 1999 for 640 units on the same 363 acres. This application was denied by the Commission on April 18, 2000. A Revised Plan/Application was filed on or about May 19, 2000. On the original application, the Commission held public hearings on January 4, January 18, February 2, February 16, March 7 and March 21, all in the year 2000. Public hearings on the Revised Plan Application were held on June 21, July 6 and July 10, 2000. The denial of this application was dated July 19, 2000. This appeal followed focusing on the July 19, 2000 denial.[1]
 AGGRIEVEMENT
CT Page 3772
By stipulation of the parties dated February 4, 2002 the subject property is presently owned and has been owned since February 26, 1997 by River Bend Associates, Inc., and has been the owner in fee of the subject property from at least November 9, 1999 to the date of stipulation without interruption or conveyance of any portion of the subject property. Further, Griffin Land Nurseries, Inc., at all times relevant hereto, has been a wholly-owned subsidiary of River Bend Associates, Inc., and has been authorized to act on behalf of River Bend. Therefore, this Court finds that River Bend is aggrieved under CGS sections 22a-43 and 22a-34.
 STANDARD OF REVIEW
"The plaintiff's burden, in challenging the action of the agency in denying the application, is to show that the agency acted arbitrarily, illegally or that the decision is not reasonably supported by the evidence." Madrid Corporation v. Inland/Wetlands Agency 25 Conn. App. 446,449 (1991). "[t]he agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given . . . The evidence, however, to support any such reason must be substantial." Huck v. Inland/Wetlands Watercourses Agency, 203 Conn. 529,539-40 (1987).(Emphasis added). "[t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency . . . We have said that an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Huck v.Inland/Wetlands Watercourses Agency, supra, Id., 542.
 ISSUES
1. Was There Substantial Evidence In The Record That Justifies Any of The Commission's Reasons As Set Forth In It's July 19, 2000 Motion Denying The Application?
The substantial evidence rule has been defined in Huck v.Inland/Wetlands Watercourses Agency, supra, pages 541-2 as follows:
"This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonable inferred . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention . . . [It] imposes an CT Page 3773 important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of `weight of the evidence' or `clearly erroneous' action" . . . (Citations omitted.) "The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence". (Citations omitted). "The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . ."
This is a complex appeal in which the Return of Record (hereinafter "ROR") contains more than 400 exhibits and 1400 pages of hearing transcripts. River Bend seeks by its application to convert a tobacco farm and nursery in the middle of a residential area to residential use.
From the totality of the evidence the Court makes the following findings:
1. Soil Mixing:
River Bend claims that prior to the close of the last public hearing on July 10, 2000 the plaintiffs agreed to all of the demands of the Commission's experts with the exception of two items. The main contaminant at the subject property is chlordane. To remediate this problem of contaminants, the plaintiffs had proposed soil mixing, removal and replacement activities in 5.47 acres of wetland buffer areas. ROR 205, 243 and 287. The plaintiffs' proposed plans for excavating and mixing soils within the 75 foot buffer area. The activities were "regulated activities" because they were in the 75 foot buffer area. They also proposed soil mixing in 124.53 acres outside the 75 foot buffer area In section 2F viii of the decision of denial the Commission stated "the proposed soil mixing, seeding, removal, and replenishment regulated activities are likely to impact or affect wetlands or watercourses". The Commission also found in section F "The Application also describes the developer's plans to mix, seed, remove, and replenish topsoils in other cultivated areas located throughout the site, which the Commission deems to be. regulated activities based on their potential to contaminate or otherwise alter or pollute wetlands and watercourses at and near the site." ROR 289. The Commission can properly consider activities that occur outside of a wetlands area (uplands activities) that are likely to impact or affect wetlands and watercourses under the ruling of QueachCorporation et al v. Inland/Wetlands Commission of the Town of Branford,
CT Page 3774258 Conn. 178 (2001). The uplands activities in this case are the 124.53 acres of soil mixing as described above.[2]
In paragraph F. ii of its decision, ROR 289, the Commission stated as follows:
 "The record suggests that soil mixing is a relatively unproven, untested and unregulated remedial method that would likely result in immediate reductions in pesticide concentrations, but would spread the contamination to greater depths and possibly into wetlands, watercourses, perched and shallow groundwater, and other environmental media through increased leaching, erosion, sedimentation, volatilization and airborne deposition."
Plaintiffs presented through its expert, Fuss O'Neill, New Jersey case studies to demonstrate that soil mixing is a safe and proven remediation method. The Commission's decision page 7 paragraph (1) states in pertinent part as follows: "The Applicant's evidence suggests that the state of New Jersey has neither reviewed, nor approved, remedial methods similar to the Applicant's proposed plan. Unlike the New Jersey sites, the Applicant's plans call for mixing of soils contaminated primarily with chlordane, often at five to ten times the state cleanup criteria." In the record is a written statement by the Commission's expert, Gordon T. Brookman, PE, LSP, LEP, President of Environmental Risk Limited (ROR 278) in which he reviewed eight case studies on soil blending in New Jersey that had been presented to the Commission by Fuss O'Neill. "My review of the summary indicates that none of the cases involved chlordane presumably because New Jersey did not have a standard for chlordane at the time of the various case studies. Most of the cases involved arsenic or dieldrin contamination in soil." In another written statement by Mr. Brookman (ROR 286) Mr. Brookman stated in referring to soil mixing that" . . . this remedial technique is not widely accepted".
The main disagreement between Mr. Brookman and the plaintiffs was that Mr. Brookman recommended that the plaintiffs be required to remove from the site, prior to mixing, all soil sample areas that showed results two times or more above the RSRs. RSR is the Department of Environmental Protection's Remediation Standard Regulations. River Bend, in its post hearing brief dated February 21, 2002, page 11, states: "Mr. Brookman's demand for removing all areas with 2 times the RSRs rather than mixing was rejected as being wholly unnecessary." What the plaintiffs are saying is that it was rejected by their expert, Fuss O'Neill. In a written statement by Mr. Brookman of February 16, 2000 (ROR 92) he stated, inter-alia, as follows: "1. ERL (Mr. Brookman's company) believes that CT Page 3775 the term `hotspot' must be defined and that soil constituting a hotspot should be removed for this site . . . Since the site is to be developed as residential, we feel that a stringent definition should be used for `hotspot'. The developer has proposed soil mixing as the preferred remedial alternative. Soil mixing is essentially mixing the contaminated soil with clean soil to lower the contaminant concentration, thereby lowering the risk from exposure to the soil. In essence the process involves spreading the contamination over a much larger volume of soil or `averaging'. While the DEP does not define `hotspot' in its remediation standard regulations it does offer an averaging technique for soils being compared to the Direct Exposure Criteria under CGS § 22a-133k-2e (1). Of note, the regulations state that no sample 2 times over astandard can be included in the average. We suggested the Town hold the developer to the definition of `hotspot' being more than two times the standard. For example, any areas with a chlordane sample result higherthan 980mg/kg would be a `hotspot' and should be removed from the siteprior to soil mixing. Using this `hotspot' definition, there are presently 12 chlordane areas and one dieldran area which would require cleanup in the Meadowood East cultivated area before soil mixing could be implemented." (Emphasis added.)
When the plaintiffs state that Mr. Brookman's demand was rejected as being wholly unnecessary, it means that it was rejected by their expert, Fuss O'Neill. The point is that Mr. Brookman insisted on a standard of two times or more above the RSRs as being unacceptable. Further, he insisted that such soil sample areas be removed from the site prior to the soil mixing. The plaintiffs and their expert(s) disagreed with this. However, as stated under Standard of Review, the Commission was not required to believe the plaintiffs' experts. It had a right to rely on its expert. Mr. Brookman, and did so.
In addition, the Commission retained Emmanouil N. Anagnostou PHD, a professor at the University of Connecticut to perform a statistical analysis of the pre and post sampling plans for soil mixing. Dr. Anagnostou concluded that the current proposed sampling plan by the plaintiffs is not sufficient. The Commission had a right to rely upon Dr. Anagnostou's opinion.
There are additional statements from Mr. Brookman, but suffice it to say that he maintained through the July 10, 2000 hearing that soil that tested at two times the standard should be removed prior to the mixing (ROR 350k). The plaintiffs disagreed with Mr. Brookman and refused to comply with his position.
Accordingly, this Court concludes that there was substantial evidence to support the reason of the Commission for denying the application on CT Page 3776 the basis that it was not satisfied with the proposals, evidence and statements of River Bend in regard to soil mixing.
 2. In its denial of the application, (ROR 289) paragraph F. ix. The Commission stated:
 "The Commission is unable to find, on the basis of the record, that there does not exist feasible and prudent alternatives to the Applicant's proposed soil mixing, seeding, removal, and replenishment regulated activities, which would cause less or no environmental impact to wetlands or watercourses. The record supports the existence of such feasible and prudent alternatives, including initial removal and off-site disposal of contaminated soils and sediment capping of contaminated soils, solid state chemical oxidation, soil washing, thermal desorption, and bioremediation. However, the Applicant has provided little analysis of such processes, other than its estimate of relative costs. No attempt was made to evaluate any of these processes on a laboratory or pilot scale. The Applicant should further investigate these and all other remedial alternatives, including more detailed analyses of each alternative's potential social and environmental detriments and benefits, as well as financial cost calculations."
In section G. v. the Commission stated that it ". . . is unable to find, on the basis of the record, that there does not exist a feasible and prudent alternative to these activities, which would cause less or no environmental impact to wetlands or watercourses. The Applicant's July 6, 2000 mark-up of a Site Grading Plan shows alternative routes of access, but does not analyze the advantages and disadvantages of alternative lot, road, and storm water control designs that would avoid or mitigate impacts to the Wetland 5 wetlands, watercourses, and ecologically connected habitats. The Applicant made reference to traffic problems that would allegedly result from alternative road designs; although no detailed traffic analyses were submitted for such alternative designs . . ."
A similar finding was made in § H. ix which stated, inter-alia: "The Applicant failed to submit sufficient analyses of alternative storm water control designs, such as permanent detention ponds, wetlands, and infiltration systems."
In all of these paragraphs the Commission stated that "The Applicant CT Page 3777 should further investigate these and all other remedial alternatives, including more detailed analyses of each alternative's potential social and environmental detriments and benefits, as well as financial cost calculations."
CGS § 22a-41 (b)(2) states in pertinent part:
 "In the case of an application which is denied on the basis of a finding that there may be feasible and prudent alternatives to the proposed regulated activity which have less adverse impacts on wetlands or watercourses, the commissioner or the inland/wetlands agency, as the case may be, shall propose on the record in writing the type of alternatives which the Applicant may investigate provided this subdivision shall not be construed to shift the burden from the Applicant to prove that he is entitled to the permit or to present alternatives to the proposed regulated activity."
River Bend provided cost estimates which were made without any supportive evidence and did not present evidence as to whether alternative methods would be effective and/or have less effect upon the wetlands and watercourses. This Court concludes that River Bend failed to meet its burden of proof that no feasible and prudent alternatives existed. Also, the Commission did specify types of alternatives which the Applicant may investigate and, therefore, complied with the requirements of CGS § 22a-41 (b) [2] as to whether or not the Commission had to propose in writing the types of alternatives which the Applicant may investigate. The Court concludes that the "in writing requirement" is directory only, and the Court will not overturn the Commission's decision because the proposed alternatives may not have been in writing. In any event they were in writing in the denial motion. Accordingly, this Court concludes that there is substantial evidence to justify the Commission's reason that the plaintiffs failed to meet their burden of proving that no feasible and prudent alternatives existed concerning these issues.
3. The plaintiffs proposed constructing Spring Hill Road through the buffer areas which would entail 34,000 square feet of grading and paving as well as 15,000 additional square feet for the construction of the road. The Commission's experts, David Lord, a wetlands scientist, and Dr. Michael Klemens, another of the Commission's experts, testified that the proposed road would endanger various species. For example, on July 6, 2000, Dr. Klemens testified, inter-alia, that ". . . we found both wood frogs and spotted salamander larva in there. We also did find fish and crayfish indicating there is a riparian element to that system also, CT Page 3778 but you also have those species there so you have, in both of these, you have, vernal pool species.[3]. . . . but you have a road here that is going to cross that and I understand there changes made to roads, but there is forest over here and patches of forest. These animals move and they move large distances, and roads are major impediments. Right now that road receives very minimal activity, activity associated with agriculture primarily, daytime activity . . . you're going to have a whole different regime on a paved road that's going to dissect these wetlands, and you're going to start to have significant mortality of animals if they move back and forth between these wooded patches." Dr. Klemens also testified that there were other locations for the road. . . . Each hundred feet that you get the roads away from the wetland, you have an exponential less kill." The plaintiffs did not present any viable alternatives to the proposed road crossing and, therefore, did not meet their burden of proving that no feasible and prudent alternatives exist for the proposed road crossing. The Court concludes that there was substantial evidence that the plaintiffs did not meet their burden of proof in this regard.
4. The Commission rejected the plaintiffs' system of storm water management basins and other structures discharging storm water into the regulated areas. In § H. i of its decision (ROR 289) the Commission stated as follows: ". . . the storm water control systems proposed by the Applicant still directs storm water runoff into regulated areas and inevitably the wetlands and watercourses noted above. The Commission finds that these activities are likely to affect, alter and pollute wetlands and are therefore regulated activities. The Revised Plan which was filed on May 19, 2000 proposed twelve storm water detention basins. Ten of the twelve basins would discharge into the wetlands or watercourses.
The plaintiffs' expert, Eric Mas of Fuss O'Neill, submitted a revised P 8 Model to estimate the percentage amount each individual storm water control device and/or watershed would remove of each of the conventional pollutants. (ROR 250). The site-wide averages of percentages that would be removed were 63.6% of the total nitrogen, 67.2% of the total phosphorous, 90.1% of the total suspended solids, 63.6% of the copper, 81.7% of the lead and 63.6% of the zinc. Table 1 of ROR 250.
This shows that the remaining amounts which would be from almost 10% of the suspended solids to over 36% of nitrogen, copper and zinc would not be removed by the storm water control devices and would flow into the wetlands and watercourses. Mr. Mas' comparison of pollutant loading through the wetlands and watercourses under existing and proposed site conditions found that annual zinc and copper loads site-wide will increase and that specific loads at many specific design points will CT Page 3779 increase significantly. These increases would go into four water courses, the Munnisunk Brook, Saxton Brook, Bissell Brook and Hop Brook.
Further, the proposed storm water basins would not be in place until after the soil mixing is competed and will not be there to catch any percentage in pollutant loads from reaching the wetlands or watercourses during the soil mixing process.
The Commission's expert, Dr. Klemens, testified inter-alia: "[d]ischarge of storm water into wetlands can adversely affect amphibian reproduction by creating thermal and chemical spikes in these wetlands at times of high rainfall, as well as excessive sedimentation that can smother eggs "and further testified that "the proposed storm water detention basins will compromise salamander reproduction."
The Commission's expert, James G. MacBroom, P.E., stated in a written report dated February 11, 2000 (ROR 95) that "the Applicant needed to address the adverse effects Meadowood would have not only in terms of quantity of runoff to the wetlands and watercourses, but also in terms ofimpacts to the water quality of the wetlands and watercourses." (Emphasis added.)
This Court, therefore, concludes that the above was substantial evidence to justify the Commission's reason for denial of the application as to storm water control systems finding that, as to the storm water control systems, "The Commission finds that these activities are likely to affect, alter and pollute wetlands and are therefore regulated activities".
5. As part of its denial the Commission found that "soil mixing to the depths proposed by the Applicant would reduce the organic content of existing topsoils and sediments that retain a large portion of the pesticide residues remaining at the site . . . The record suggests that this disturbance may increase pesticide mobility and result in greater transport of pesticides into perched and shallow groundwater that drains into wetlands and watercourses and greater pesticide transport directly into wetlands and watercourses from mixed soils and sediments that erode or disperse into such areas." (§ 2.F.iii) (ROR 289). The Commission's expert, Mr. Brookman, in his March 16, 2000 letter to Laurie P. Whitten Conservation/Inland Wetlands Compliance Officer of the Town of Simsbury (ROR 137) stated in pertinent part: "Chlordane and dieldrin because of their high adsorption rate tend to accumulate in the soils near the surface. Both pesticides are extremely persistent . . . Thus, as has been shown by test data at the site, these materials are attached to the soil at or near the surface and are available to be washed away with storm water runoff. In areas prone to high quantities to runoff, this would CT Page 3780 make the pesticides quite mobile . . . the concentration of the pesticide will also affect the mobility. Hotspots (high concentrations) of the pesticides could result in less than complete adsorption of the pesticides on the soils, and increase the availability of the pesticides to leach or migrate into the groundwater. Thus hotspots potentially can result in the pesticides having increased mobility . . . In summary, hotspots of pesticide contamination present the highest risk of pesticide migration through or from soils".
In addition, David Lord of Soil Resource Consultants, the Commission's expert, presented a written statement dated July 2, 2000 (ROR 270) that states interalia:
 "The soils erosion and sediment control measures proposed for [soil mixing] areas within the wetland buffer zones do not appear to adequately address the issue of potential movement of fine soil particles and organic matter to adjacent wetlands. Sediment filter fencing is at most seventy-five percent effective in trapping sediments. The twenty-five percent fraction which contains the finest soil particles generally passes through sediment filter fencing."
Therefore, this Court concludes that there was substantial evidence for the Commission's reason for denial of the application that the proposed soil mixing may increase pesticide mobility and result in greater transport of pesticides into perched and shallow groundwater that drains into wetlands and watercourses and greater pesticide transport directly into wetlands and watercourses from mixed soils and sediments that erode or disburse into such areas.
The Court notes that this finding is a logical reason for removing the hotspots prior to the soil mixing as insisted upon by Mr. Brookman.
6. The Commission decided as a reason for denial that development activities in the Upland Areas would sever the inter connected wetlands so as to adversely affect existing wetlands and watercourses on the site.
In its decision of July 19, 2000 in section A, the Commission stated that "The subject property and surrounding region provide habitat for many species of flora and fauna, including sensitive vernal pool species and other wetland dependent species . . . the property provides ecological connections among the region's many natural resources, including several inland/wetlands and watercourses." In section B some of the species already mentioned are mentioned therein, and, then, it is CT Page 3781 stated: "Dr. Klemens, a herpetologist with considerable expertise on Connecticut vernal pools and amphibians, concluded that `there is a high potential for the occurrence of two State-listed Special Concern species on the site,' the Eastern Box Turtle and the Eastern Ribbon Snake. Noting that the Applicant had identified the presence of Spotted Salamanders at several site wetlands and citing related studies on amphibian migration, Dr. Klemens concluded that the 363 acre tract and its wetlands are part of a much larger, interconnected ecosystem."
In section E the Commission stated ". . . the Commission agrees with the opinions of Dr. Klemens, as presented at the July 6, 2000 hearing and in his reports and publications. Specifically, the site's wetlands and watercourses are a vital part of a larger ecosystem in the region and arenot severed into isolated islands of wetland habitats as suggested by theApplicant's consultant." (Emphasis added). Dr. Klemens in a report (ROR 17) also stated that "[t]he current plan maximizes the development of the site, creates open space and greenways that give the feel (to humans) of nature, but in fact, serve to seriously compromise and eliminate the rich and varied ecosystem on site." In the same report he states "[t]he development proposed as presented will, for the first time, fragment these [vernal] pools from one another by development and roads." Further, he goes on in a written statement dated March 7, 2000 to say, inter-alia: "If this site is to be developed in a prudent manner, it will involve examining the big picture. The approach that is being used repeatedly by Mr. Pawlak (the plaintiffs' expert) is to segment the review (and the ecosystem) into little pieces, which lose their ecological context and importance". Dr. Klemens goes on to say in a written statement of June 27, 2000:" The current proposal fails to address the issue of wetland and ecosystem connectivity . . . The Applicant's wetlands consultant is disingenuous in his characterization of the wetlands on the site as `islands' (see top of page 12) [of Edwards Pawlak's report] rather than integral parts of an interconnected system of wetlands and uplands, extending through this property to adjacent areas of open space. Although some of these connections may have been weakened by agricultural activity, they are not severed, and could be enhanced and restored as part of a more thoughtful development process." (ROR 259).
Dr. Klemens also testified that "The development proposal as presented will, for the first time, fragment these [vernal] pools." (ROR 17).
Therefore, this Court concludes that there was substantial evidence before the Commission for it to decide that the development activities of the Applicant would sever the interconnected wetlands so as to adversely affect existing wetlands and watercourses on the site. CT Page 3782
The Court recognizes that it is very difficult for an Applicant to overturn a decision of an inland/wetlands agency/conservation commission. That difficulty is clear in this case.
 CONCLUSION
In light of the substantial evidence rule, the fact that the Commission can believe or disbelieve any experts or witnesses and the fact that if one of the reasons given by the Commission for its denial is supported by substantial evidence, the Court concludes that the plaintiffs have not sustained their burden of proving that the decision of the Commission was illegal, arbitrary or not supported by substantial evidence.[4]
Accordingly, this appeal is dismissed.[5]
____________________ Rittenband, JTR